Chad E. MARCUM, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 48S00–9803–CR–185.

Supreme Court of Indiana.

March 29, 2000.

Rehearing Denied May 31, 2000.

Robert W. Rock, Anderson, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Chad E. Marcum was convicted of murder, attempted murder, conspiracy to commit burglary, two counts of auto theft, and theft. He was sentenced to an aggregate term of seventy-one years imprisonment. In this direct appeal he contends that (1) he was denied a fair trial because of the partiality of the trial judge; (2) the prosecutor engaged in misconduct that requires reversal of his convictions; (3) the trial court impermissibly restricted his right to cross-examine witnesses; (4) the trial court erred in certain evidentiary rulings; (5) the trial court erred by ruling a police officer's report inadmissible under Evidence Rule 803(5); (6) the jury's verdict on the murder and attempted murder counts is not supported by sufficient evidence; and (7) the trial court erred in sentencing him. We affirm the convictions, except one count of auto theft which is barred by double jeopardy, and remand this case for imposition of concurrent sentences on the remaining counts.

**Factual and Procedural Background**

In late May of 1997, Marcum, Mikkel Kendall, Jack Skinner, and James Fosnot planned a home burglary. They first stole the keys to a van from an auto dealership just outside of Anderson, then located a "fence," and returned to the auto dealership to steal a van. After donning gloves and leaving their identifications in Fosnot's car, they proceeded to the targeted house in the stolen van. When they arrived they were surprised to find the home occupied and left without entering. Kendall was driving at a high rate of speed and eventually lost control of the van. The vehicle rolled over several times before coming to rest in a field.

A police officer responding to the accident found Skinner on his knees beside the van, screaming in pain and saying he was going to vomit. Fosnot was unconscious approximately thirty yards away. Paramedics were called, but Skinner died before they arrived. Fosnot remained in a coma for eleven days. Based on her observation of Skinner at the scene, the coroner ruled that Skinner had died as a result of the accident. No autopsy was performed at that time.

After regaining consciousness, Fosnot told police that Kendall and Marcum had hit him and knocked him out. The coroner reopened the case, and nearly two months after the accident, Skinner's body was exhumed for an autopsy. Dr. John Pless, a forensic pathologist at the Indiana Univer-

sity School of Medicine, conducted the autopsy and concluded that Skinner had died as the result of "blunt force injury to the chest and head with aspiration of gastric contents." Dr. Pless concluded that Skinner did not die from injuries received in the accident. This was based on several considerations. None of Skinner's injuries were "severe," i.e., involving broken bones or lacerated internal organs. Rather, they were "moderate" and "of a blunt force nature indicating that the objects that struck him were smooth and somewhat rounded." There were no abrasions on Skinner's body of the kind that would be expected if Skinner been thrown from the van onto a rough surface. Moreover, although accident victims normally sustain injuries on one side of the body or the other, Skinner had injuries "on all surfaces of his body," not just from one direction as would be usual for an accident victim. Finally, the injuries were incurred in places such as under Skinner's arm "that you don't ordinarily see injured in automobile accidents."

Shortly after the accident, Fosnot's car was reported stolen by his father. After the car was entered into a national database of stolen vehicles, it was located on an Air Force base in Mississippi and impounded by military police. The following day Marcum and Kendall were arrested in Mississippi on warrants from Madison County.

After being transported from Mississippi back to Indiana, Kendall gave a statement to police in which he stated that Marcum had killed Skinner by beating him with a pipe and stomping on him. According to Kendall, Marcum had previously told him that he wanted to kill Skinner because Skinner had ridiculed a young woman for her weight.

Marcum was charged with six counts: murder, attempted murder, conspiracy to commit burglary, carjacking, auto theft, and theft. At trial, the State called Dr. Pless, who testified that he believed Skinner had not died in the accident but rather had been killed by being beaten. Marcum called an expert who opined that the autopsy did not prove death from either a beating or a motor vehicle accident. The jury found Marcum guilty of auto theft as a lesser included offense of carjacking and guilty of the remaining counts as charged. The trial court sentenced Marcum to fifty-five years for murder, thirty years for attempted murder, and ten years for conspiracy, three years for each auto theft conviction, and six months for theft. It ordered the murder, conspiracy, and auto theft counts to be served consecutively for a total sentence of seventy-one years imprisonment.

## I. Alleged Partiality of the Trial Judge

■■■■ Marcum first argues that he was denied his right to a fair trial because of the partiality of the trial judge. The right to a fair trial before an impartial judge is an essential element of due process. *See Abernathy v. State*, 524 N.E.2d 12, 13 (Ind. 1988). As this Court observed in *Kennedy v. State*, 258 Ind. 211, 226, 280 N.E.2d 611, 620–21 (1972):

A jury of laymen will often have an awesome respect for the institution of the American trial judge. This can lead them to accord great and perhaps decisive significance to the judge's every word and intimation. It is therefore essential that the judge refrain from any actions indicating any position other than strict impartiality.

A trial court is given latitude to manage the courtroom and maintain order and decorum. *See Timberlake v. State*, 690 N.E.2d 243, 256 (Ind.1997). "Even where the trial court's remarks display a degree of impatience, if in the context of a particular trial they do not impart an appearance of partiality, they may be permissible to promote an orderly progression of events at trial." *Id.* (quoting *Rowe v. State*, 539 N.E.2d 474, 476 (Ind.1989)). However, reversal is required if the defendant shows that the trial judge's actions and demeanor crossed the barrier of impartiality and

prejudiced his or her case. *Timberlake*, 690 N.E.2d at 256.

■ Marcum points to several instances of alleged partiality by the trial court. First, Marcum cites the following exchange in the course of defense counsel's questioning of the defense's medical expert:

Q. I am not asking if the person died as a result of this accident, did a person die in this accident?

A. The autopsy would indicate that. You don't normally do autopsies on people who are alive.

Q. Okay.

[PROSECUTOR:] Judge again this is an inappropriate way to frame that question. There is no evidence that anybody died in an accident. There is no evidence in this trial, there is no evidence that has been admitted in this trial. He has asked this doctor for a professional conclusion, whether somebody died in an accident. That is assuming facts not in evidence.

JUDGE: And he is right Mr. Oliver. If that is the end result that is okay but your question presumes that the deceased died as a result of the accident. So far the evidence has been that he died as a result of a homicide.

Marcum moved for a mistrial based on the trial court's comment. The trial court overruled the motion, observing that defense counsel's question "presume[d] the ultimate fact and so far the evidence has not been that.... If you will just ask the question a different way it is okay sir."

Marcum contends that the trial court improperly commented on a fact in controversy, i.e., whether Skinner died as a result of the automobile accident or from a homicide. This was occasioned by defense counsel's phrasing of a question that assumed the defense's conclusion as to the manner of death. The trial court correctly observed that the evidence to that point did not support that assumption.[1] This comment did not necessitate a mistrial and was invited by defense counsel.

■ Marcum next points to a comment made by the trial court during his questioning of Fosnot. Defense counsel (Mr. Oliver) asked if Mr. Cummings, the prosecutor, had "charge[d] [Fosnot] any bond money," and the trial court interposed the following comment: "Excuse me Mr. Oliver. I am pretty sure the Judge does that, not Mr. Cummings.... In this Court the Judge sets the bond sir." This comment presents no basis for reversal.[2]

■ Marcum also argues that the trial court made an improper comment after the jury returned its signed verdict forms in open court. The trial court realized that the verdict form signed by the foreman for auto theft as charged in count six did not include the word guilty. The "not guilty" form for that count was not signed by the foreperson of the jury. The trial court then stated:

I know the intent was he is guilty but it doesn't say guilty. Members of the Jury I have discovered a mistake and it is not your mistake it is ours. The verdict form for Count VI does not contain the word "guilty." It simply says,

1. By this point in the trial the State had presented evidence from Dr. Pless who opined that Skinner had died as a result of "blunt force injury to the chest and head with aspiration of gastric contents," and not as a result of a vehicle accident. The State had also called the Madison County Coroner, who testified that she had determined that her original finding that Skinner had died as a result of the accident was erroneous and had instead ruled that Skinner died in a manner consistent with Dr. Pless' findings. Only after

this point did the defense expert testify that it was a "coin toss" what caused Skinner's injuries.

2. Marcum also contends that the trial court improperly limited his cross-examination of Fosnot, which further shows its partiality. However, as explained in Part III., the limitation on cross-examination was not error. For the same reasons, it does not evince a lack of impartiality on the part of the trial court.

"We, the jury, find the defendant, Chad Marcum, Count VI, Auto Theft." It is my view that you intend to find him guilty because you did not sign the form of verdict that says not guilty. If you will retire to the jury room, if it is your intention to find him guilty, please add the word guilty at the top, and then I will receive your verdict for Count VI.

Defense counsel did not object to this comment or procedure, and the jury retained the option of writing "not guilty" on the form, if that was its intention. However, the foreperson wrote the word "guilty" on the form before returning it in open court. Under these circumstances this comment presents no basis for finding a lack of impartiality on the part of the trial court.

■ Finally, Marcum points to an instance in which he made a continuing objection to testimony he believed to be hearsay. The trial court overruled the objection, observing, "And it very well may be Mr. Oliver, but I am going to allow it." The State had asserted that the testimony was not hearsay because it was not offered for the truth of the matter asserted. Marcum makes no argument in this appeal that the trial court's ruling on this issue was erroneous. Therefore, there is no basis for finding a lack of impartiality on the part of the judge for making what appears to be a proper ruling on an evidentiary issue.

In sum, Marcum has failed to demonstrate that the comments cited above demonstrate partiality of the trial judge or that they prejudiced his case. *See Timberlake,* 690 N.E.2d at 256.

## II. Prosecutorial Misconduct

■ Marcum next contends that Madison County Prosecutor Rodney Cummings engaged in misconduct that warrants reversal of Marcum's convictions. A claim of prosecutorial misconduct requires a determination that there was misconduct by the prosecutor and that it had a probable persuasive effect on the jury's decision. *See Cox v. State,* 696 N.E.2d 853, 859 (Ind.1998). Although we agree that many of Cummings' comments, which often belittled and ridiculed defense counsel, were inconsistent with the requirement that lawyers "demonstrate respect for the legal system and for those who serve it, including ... other lawyers," *see* Preamble, Ind. Professional Conduct Rules, his conduct does not establish a claim of prosecutorial misconduct.

Marcum first points to comments made by Cummings during redirect examination of Fosnot. Fosnot testified on direct that he, like Marcum and Kendall, stood charged with conspiracy to commit burglary and auto theft, but that the State had promised him nothing in exchange for his testimony. Marcum cross-examined Fosnot about this at length and suggested that Cummings had told Fosnot to say that he was promised nothing but "winked his eye and nodded in agreement." Cummings then followed up on redirect about what Fosnot believed would happen to him in regard to the pending charges. Defense counsel objected because "[t]his is self-serving, that is speculation." Cummings responded, "No, what this is, is a response to your nonsense." Defense counsel's inquiry into the possibility of a deal between the State and Fosnot, in light of the fact that Fosnot was released on his own recognizance after being charged with two felonies, was hardly "nonsense." Rather, it appears to be an obviously valid line of inquiry.

■ In a similar vein, Cummings made other demeaning remarks directed at defense counsel. He stated that defense counsel's continued questioning of a witness in the face of an objection was "outrageous behavior for anyone who calls themselves a professional lawyer." In response to a hearsay objection by defense counsel, Cummings responded, "Judge the rules of evidence that I read don't even make that a close call.... Judge I guess we can move the jury out and we can do a quick evidence course here for Mr. Oliver." At another point, Cummings stated that "this

is about the third time that Mr. Oliver has said that, maybe he needs to pay a little more attention to what is going on." Although attorneys become frustrated in the heat of a lengthy trial, comments that demean opposing counsel, especially in front of a jury, are inappropriate, and these fall into that category.

In response to defense counsel's argument that a statement was admissible as a dying declaration, *see* Ind. Evidence Rule 804(b)(2), Cummings stated, "And those were not the last words. He is trying to mislead this jury...." This comment attacks the integrity of defense counsel by suggesting that he is trying to mislead the jury. Because the reports being shown to the witness are not in the record, we have no basis to evaluate the prosecutor's contention that the report did not contain Skinner's last words. Even if this were the case, there is no reason to suggest that defense counsel's contrary view was an attempt to mislead the jury, as opposed to an honest mistake.

Marcum next points to a comment made by Cummings during Marcum's direct examination of his medical expert, who was licensed to practice both law and medicine.

A. It is my opinion after reviewing the autopsy report, these photographs and the other documentation I have been provided that there is no way to tell from this autopsy. There is no better than the flip of a coin which caused these injuries.

Q. And you say no better than the flip of a coin and a coin has how many sides?

A. Two (2).

Q. Is that what you mean Doctor?

A. Exactly what I mean. And this autopsy doesn't prove guilt to me.

MR. CUMMINGS: Judge that is unbelievable. I thought this guy was a lawyer. I cannot believe he said that.

Although not specifically stating the basis of his objection, it appears that Cummings was objecting on the ground that the witness was testifying to an opinion concerning guilt or innocence, which is prohibited by Evidence Rule 704(b). Cummings was apparently contending that because the witness was a lawyer, he should have known that his comment was improper. Nonetheless, a simple objection to the testimony on the ground that it violated Evidence Rule 704(b) would have sufficed.

■ Finally, Marcum points to the following exchange during Cummings' cross-examination of him:

Q. You are not responsible for the theft of that van, is that what you are telling these ladies and gentlemen?

A. I am responsible but I....

Q. Should you be found guilty of that crime?

A. Yes.

Q. Then why are we having a trial on that issue? Why didn't you just plead guilty.

MR. OLIVER: Judge this is not appropriate, Judge. Is it appropriate?

....

JUDGE: Please gentlemen, please. There are many reason[s] for that decision. It seems awkward to me that you are making that inquiry. We are here so we will make the best of it. Go on please.

We agree that this question is improper. Marcum admitted that he was guilty of one of the six charges against him. He was under no obligation to plead guilty and was entitled to a trial at which the State was required to prove him guilty beyond a reasonable doubt. The fact that he admitted on the stand that he was guilty of one charge does not suggest his guilt of the remaining charges.

Although many of Cummings' comments were improper, and some appear to be direct violations of the Rules of Professional Conduct, Marcum is not entitled to relief on his claim of prosecutorial misconduct because he has not established that

the improper comments had a probable persuasive effect on the jury's decision.[3] *See Cox*, 696 N.E.2d at 859. Breaches of civility and attacks on the integrity or competence of counsel, particularly in a context where opposing counsel is giving as well as taking, are ordinarily matters for another forum. At least in the examples cited here, we cannot conclude that these comments would have affected the jury's verdict in light of the evidence as a whole. As with other breaches of professional obligations, reversal of a criminal conviction is not the only forum in which to raise these issues. *Cf. Goodner v. State*, 714 N.E.2d 638, 642–43 (Ind.1999).

### III. Limitations on Cross–Examination

■ Marcum next contends that the trial court infringed upon his Sixth Amendment right to cross-examine witnesses. Although this right is "one of the fundamental rights of our criminal justice system," *Pigg v. State*, 603 N.E.2d 154, 155 (Ind.1992), it is "subject to reasonable limitations placed at the discretion of the trial judge." *Smith v. State*, 721 N.E.2d 213, 219 (Ind.1999) (quoting *McQuay v. State*, 566 N.E.2d 542, 543 (Ind.1991)). "[T]rial judges retain wide latitude … to impose reasonable limits … based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The limitations raised by Marcum in this appeal fall within the "wide latitude" conferred on the trial court.

■ Marcum first argues that the trial court improperly limited his cross-examination of Fosnot. Fosnot had given two statements to a detective, and defense counsel sought to impeach Fosnot's trial testimony based on these statements. Fosnot testified that, although he remembered talking to the detective, he did not remember what they had discussed. In response to another question from defense counsel, Fosnot responded that he did not remember talking about the facts surrounding these crimes. The trial court eventually asked Fosnot if he remembered "anything" he had told the detective in either interview, and Fosnot responded that he did not. After an extensive colloquy outside the presence of the jury, the trial court observed that Fosnot "can't re-

---

3. Some of the other cited instances are clearly not misconduct. For example, Marcum points to Cummings' suggestion that Kendall changed his story "after he has had a chance to speak to his lawyer, after he has had a chance to talk to any number of people in the jail. A lot of time has passed since then." Marcum contends that this comment improperly "attacks attorneys in general and the Defendant's attorney by its implication that attorneys counsel their clients to obstruct justice or conceal the truth." The comment pointed out that Kendall's story changed after the passage of time during which he had spoken to several people, including his attorney. The comment does not attack Kendall's attorney nor does it in any way attack Marcum's counsel.

In addition, Marcum contends that Cummings committed misconduct in his cross-examination of Fosnot's aunt, Patricia Hittle. Hittle had testified that Fosnot's father "made up" the allegations against Marcum and Kendall, and Cummings then asked if Fosnot's father "fooled the Judge too when the Judge issued an exhumation order." This question did not imply, as Marcum contends, "that since the Judge issued an order the Defendant must be guilty." Rather, it merely pointed out that the alleged lies of Fosnot's father appeared to be worthy of an investigation.

Finally, Cummings did not engage in misconduct by asking Kendall, "Where do you draw the line, where do criminals draw the line on what they will do to one another?" Marcum contends that this question was improper because it "suggests that the Defendant along with the other three men were all criminals. Furthermore, it suggested that since the Defendant is a criminal he should be convicted." We disagree. This question was asked during redirect to discredit Kendall by pointing out that he had admitted taking Fosnot's car and Skinner's check before leaving the state, but not to physically harming them. We see no impropriety with this question as it pursued a valid line of inquiry – Kendall's credibility – without impermissibly suggesting Marcum's guilt.

member anything. He said it at least six (6) times and perhaps more. And you persist on picking nits with him and demanding that he answers questions that he says he can't remember." The colloquy escalated to include the following exchange, outside the presence of the jury, between defense counsel and the trial court:

> JUDGE: Mr. Oliver, I gave you clue after clue that you were headed down a dead end and apparently you didn't pick it up.
>
> MR. OLIVER: Judge I want the record to reflect that I feel the Court is hampering my cross-examination.
>
> JUDGE: That is exactly right. I have hampered it, I have shut it off because you are wasting everybody's time and you won't do what you are suppose to do. Get the jury. Thank you Mr. Oliver. But I am going to allow you to play the tape. I told you that.

We find no abuse of discretion in limiting this line of cross-examination in light of Fosnot's repeated denials of memory of the prior statements.

Marcum also makes several brief contentions about limitations on the cross-examination of other witnesses but offers little in the way of a cogent argument that any of these limitations were an abuse of discretion. In cross-examination, Marcum asked Phillip Craig, the prospective fence, whether he had been in the courtroom earlier in the day and heard other witnesses testifying. Craig responded that he had not. Although the prosecutor's objection was sustained, the testimony was not stricken. Under these circumstances, it is difficult to see how Marcum's cross-examination was restricted. There is similarly little substance to Marcum's claim with respect to the testimony of Autumn Stewart. Kendall and Marcum had walked to Stewart's house immediately after the accident. Although the trial court sustained the State's objection to a question regarding whether Stewart had seen Marcum or Kendall use the telephone, de-

fense counsel proceeded to ask–and Stewart answered–questions on the subject. She stated that Kendall called two different people; she heard both conversations; and Kendall asked somebody to pick him up, but no one ever did. Defense counsel then asked if Stewart had heard Kendall call the hospital, and she responded affirmatively. However, when asked if Kendall had inquired about the condition of Fosnot and Skinner, the State objected and the trial court sustained the objection, reasoning that, "I just don't understand the purpose of asking about Kendall's concern about the injured gentlemen in the traffic collision. I don't know how that is relevant to this case." The trial court offered defense counsel a hearing on the issue, but defense counsel declined, stating "I am ready to move on." We can see the potential relevance of this inquiry, but because it was abandoned by defense counsel it presents no issue here.

 On cross-examination Marcum asked a detective if Kendall had said anything in his statement to police to the effect that Marcum had done nothing to harm Stewart or Fosnot. The trial court sustained the State's objection. Moments earlier the detective had testified that Kendall had given two different stories and had agreed with Marcum's question that in one of the stories Marcum "did nothing, it was an accident and they left the scene." The limitation of this repetitive testimony was not an abuse of discretion. *See Coates v. State,* 534 N.E.2d 1087, 1095 (Ind.1989) (finding no abuse of discretion in trial court's limitation of repetitive cross-examination). The same is true of Marcum's claim that he was not permitted to cross-examine his mother's boyfriend, Rick Tipton.

### IV. Evidentiary Rulings

 Marcum also contests a number of evidentiary rulings by the trial court. He contends that some items should have been excluded under the relevancy requirements of Evidence Rule 401 and the

balancing of probative value against the danger of unfair prejudice of Evidence Rule 403. We review the admissibility of evidence pursuant to these rules for an abuse of discretion. *See Ingram v. State,* 715 N.E.2d 405, 408 (Ind.1999); *Willsey v. State,* 698 N.E.2d 784, 793 (Ind.1998).

■ Marcum first points to the State's redirect examination of Fosnot on the effect of the pending charges against him. The State asked the following questions and Fosnot provided the following answers:

Q. You are afraid I may not cut you any slack aren't you?

A. Yes.

. . . .

Q. In fact you are concerned what I might do aren't you?

A. Yes sir.

Q. What do you think I might do?

A. I am figuring I will probably go to prison just like everybody else.

Defense counsel then objected, and the objection was overruled. This questioning followed extensive cross-examination by defense counsel about whether there had been a "wink-and-nod" deal between the prosecutor and witness in exchange for his testimony, and was proper redirect.

■ Marcum next points to the following comment by Phillip Craig, in response to a question by the State about why he did not like Marcum and Kendall: "They were ... acting like they were in a gang and I just don't like that type of attitude." Defense counsel objected, stating that Marcum "is in no gang. I object, he doesn't know that." The State responded that the information was "totally irrelevant and I don't really want to go into the merits of whether he is or whether he isn't." Even in face of the State's concession that Craig's response was "totally irrelevant," the trial court overruled

Marcum's objection. Although the trial court's ruling was arguably erroneous, the suggestion that Marcum and Kendall acted "like they were in a gang" is not tantamount to actual gang membership and the State asked no further questions on the subject. Because this testimony did not affect Marcum's substantial rights, any error in its admission was harmless. *See* Ind. Trial Rule 61; Ind. Evidence Rule 103(a).[4]

■ Finally, Marcum contends that the trial court erred in overruling his objection to the State's questioning of Marcum's expert about his reason for not talking before trial to Dr. Pless, the pathologist who had performed the autopsy and testified for the State. Marcum's expert testified, "Two (2) other physicians told me not to talk to another witness in the case." The State later asked, "And you are taking legal advice from doctors who are not lawyers?" Defense counsel objected, asserting "That is not legal advice." Marcum's expert then explained that he was taking "ethical advice," and not legal advice from these physicians. Asking the witness why he had not spoken to Dr. Pless was a relevant line of inquiry. The trial court did not abuse its discretion by overruling Marcum's objection.

## V. Recorded Recollection

■ Marcum called Officer Tim Basey to testify at trial. Defense counsel showed Basey an accident report and two supplemental reports that Basey had prepared. The reports apparently contained "the last words of Skinner" as related to Basey by another officer. Marcum sought the admission of these exhibits at trial, asserting several different exceptions to the hearsay rule. He does not advance any of those in this appeal, but rather asserts now that

---

4. Marcum also contends that this ruling "violated Rule of Evidence 611(a)(3) because the witness was subjected to undue embarrassment and harassment by the State." This ground for objection was not made at trial, and is therefore waived. *See Willsey,* 698 N.E.2d at 793.

the reports were admissible under the recorded recollection exception to the hearsay rule. *See* Ind. Evidence Rule 803(5). However, Marcum is limited to the specific grounds argued in the trial court and cannot assert new bases for admissibility for the first time on appeal. *See Taylor v. State,* 710 N.E.2d 921, 923 (Ind.1999). Any claim of error based on Evidence Rule 803(5) is waived.

## VI. Sufficiency Of The Evidence

Marcum next contends that there is insufficient evidence to support his convictions for murder and attempted murder. He argues that these convictions rest "upon the sketchy memory of Fosnot, the dubious speculation of Dr. Pless, and the shifting sands of Kendall's inconsistent statements." He asserts that the jury could only have found him guilty by drawing unreasonable inferences.

 Our standard of review for sufficiency claims is well settled. We do not reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Taylor v. State,* 681 N.E.2d 1105, 1110 (Ind.1997). For purposes of sufficiency review, "[o]therwise inadmissible hearsay evidence may be considered for substantive purposes and is sufficient to establish a material fact at issue when the hearsay evidence is admitted without a timely objection at trial." *Humphrey v. State,* 680 N.E.2d 836, 840 (Ind.1997) (quoting *Banks v. State,* 567 N.E.2d 1126, 1129 (Ind.1991)).

 Drawing reasonable inferences from the testimony at trial, there is sufficient evidence to support both convictions. Detective Harp testified that shortly after

regaining consciousness Fosnot told him he had been hit by Kendall and Marcum and knocked out at the scene of the accident.[5] Harp also testified that Kendall told him that Marcum had beaten Skinner and Fosnot. Defense counsel did not object to this testimony nor did he tender an instruction informing the jury that this testimony could be considered only for impeachment purposes. Accordingly, the testimony could be considered by the jury as substantive evidence. *See Humphrey,* 680 N.E.2d at 840–41. In addition, an autopsy revealed that Skinner had died as the result of blunt force injury to the chest and head with aspiration of gastric contents. The pathologist did not believe Skinner died in a vehicle accident because the objects that struck him were smooth and somewhat rounded and "he has injuries on all surfaces of his body indicating the forces are coming from several different directions," unlike a vehicle accident in which injuries are generally on one side of the body or the other. Although Kendall and Marcum offered a different version of events at trial, it was the jury's prerogative to weigh the conflicting evidence. *See Robinson v. State,* 699 N.E.2d 1146, 1148 (Ind.1998). There is sufficient evidence to support the convictions for murder and attempted murder.

## VII. Sentencing

 Marcum argues that his seventy-one year "sentence is erroneous and manifestly unreasonable because it lacks logic, i.e., on the one hand the trial court found that the aggravating and mitigating circumstances were balanced, but in contrast, the trial court imposed consecutive sentences." The trial court imposed the presumptive term on three counts (murder, attempted murder, and conspiracy to commit burglary), the minimum six-month sentence for theft as a Class D felony, and the maximum term of three years for each of

---

**5.** At trial, Fosnot testified that he was not ejected from the van but rather exited the van, walked toward a light, and was struck from behind. He claimed no further memory of the events.

the auto theft counts. Before imposing sentence, the trial court identified Marcum's youthful age as the sole mitigating circumstance. Although it did not initially identify any aggravating circumstances, in response to a query from defense counsel after imposing sentence the trial court stated, "This was a series of incidents, events or occurrences, a crime of spree." The trial court specifically found that "the aggravating and mitigating circumstances are in fact in balance," but ordered that the murder, conspiracy, and two auto theft counts be served consecutively.

In order to impose consecutive sentences, the trial court must find at least one aggravating circumstance. *See Morgan v. State*, 675 N.E.2d 1067, 1073 (Ind. 1996). The same aggravating circumstance may be used to both enhance a sentence and justify consecutive terms. *See, e.g., Taylor v. State*, 710 N.E.2d 921, 925 (Ind.1999); *Brown v. State*, 698 N.E.2d 779, 781 (Ind.1998). Here, however, because the trial court found the aggravating and mitigating circumstances to be in balance, there is no basis on which to impose consecutive terms. Accordingly, this case is remanded to the trial court with direction to impose concurrent sentences on all counts.

### VIII. Double Jeopardy

As a final point, we note that Marcum was convicted and sentenced for both auto theft, as charged in Count VI, and conspiracy to commit burglary. Double jeopardy precludes both of these if there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Richardson v. State*, 717 N.E.2d 32, 53 (Ind.1999); *accord Griffin v. State*, 717 N.E.2d 73, 89 (Ind.1999); *Guffey v. State*, 717 N.E.2d 103, 106 (Ind.1999).

The preliminary and final instructions told the jury that (1) Marcum was charged with conspiracy to commit burgla-

ry; (2) the overt act in furtherance of the agreement was the "theft of a 1990 red Pontiac Transport from Lesley McQueary;" and (3) Marcum was charged with the theft of that same vehicle. The jury was also instructed that in order to prove the conspiracy charge, the State "must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement" and that an overt act was an element of the conspiracy offense.

Under these instructions, there is at least a reasonable possibility, if not a near certainty, that the jury used the same evidentiary fact—Marcum's theft of a 1990 red Pontiac Transport belonging to Lesley McQueary—to prove an essential element of conspiracy to commit burglary and also the essential elements of the auto theft in Count VI. Because these convictions and sentences violate the Indiana Double Jeopardy Clause, we remand to the trial court with direction to vacate Count VI.

### Conclusion

The judgment of the trial court is affirmed in part. This case is remanded to the trial court with instructions to vacate Count VI and impose concurrent sentences on the remaining counts.

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.