## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 24 2016, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Octavius Morris,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 24, 2016

Court of Appeals Case No.
24A01-1512-CR-2206

Appeal from the Franklin Circuit Court

The Honorable J. Steven Cox, Judge

Trial Court Cause No.
24C01-1404-FB-268

**Pyle, Judge.**

# Statement of the Case

Octavius Morris ("Morris") appeals, following a jury trial, his conviction for Class B felony burglary.[1] He alleges that there were three instances of prosecutorial misconduct during the State's closing argument—only one of which he objected to—and argues that the cumulative effect of the prosecutor's three comments constituted fundamental error. Concluding that Morris has not met his burden of showing prosecutorial misconduct and fundamental error, we affirm his conviction. Additionally, because the record before us reveals that the trial court entered a separate sentence on Morris's habitual offender determination instead of enhancing his Class B felony burglary sentence, we remand to the trial court with instructions to correct this irregularity in the relevant sentencing documents.

We affirm and remand.

# Issue

Whether the cumulative effect of the three allegations of prosecutorial misconduct amounted to fundamental error.

# Facts

In 2014, Morris and Tiffany Ramey ("Ramey") were involved in a relationship. At that time, Ramey worked for a health care company that provided home

---

[1] IND. CODE § 35-43-2-1. We note that, effective July 1, 2014, a new version of the burglary statute was enacted and that Class B felony burglary is now a Level 4 felony. Because Morris committed his crime in April 2014, we will apply the statute in effect at that time.

health care to disabled adults. One of the homes where Ramey provided in-home care was the Franklin County home of Timothy Cutcher ("Cutcher") and his wife, Karen Hoog ("Hoog") (collectively, "the Cutchers"). Hoog's adult sister, Wendy, who has a developmental disability and requires in-home caregivers, alternated living with the Cutchers and Hoog's other sister every two months. Ramey went to the Cutcher's home two days per week to care for Wendy during the months that Wendy resided with the Cutchers. In order to provide the caregivers, such as Ramey, access to the house when the Cutchers were at work, they routinely left a door unlocked.

[4] In April 2014, Ramey, who was having financial difficulties, told Morris about the "nice things" in the Cutcher's house. (Tr. 243). Morris and Ramey decided to burglarize the Cutcher's house as "an easy way to make money[.]" (Tr. 243). On April 2, 2014, Morris and Ramey went to the Cutcher's house because Ramey knew that the Cutchers would be at work and that Wendy would not be there. Morris and Ramey entered the Cutcher's house via the unlocked door. Morris instructed Ramey to take the two piggy banks, and he took two fifty-inch TVs from the house. As they drove away from the Cutcher's house, Morris told Ramey that if he had known that it would have been "that easy, he would've got[ten] a box truck and . . . some of his boys and . . . cleaned them out." (Tr. 264). Morris and Ramey also discussed selling the TVs and splitting the money.

[5] That same day, Morris and Ramey took the piggy banks to Woodruff's Supermarket, where Ramey's sister, Whitney Ramey ("Whitney"), worked. A

surveillance camera captured videotape of Morris and Ramey, with piggy banks in hand, as they entered the store. Morris and Ramey went to Whitney's register, where they counted and wrapped the coins and exchanged them for cash. As they were counting the coins, Whitney noticed that there were dollar and half-dollar coins. Whitney, concerned that Ramey had taken the money from Whitney's niece and nephew, asked Morris and Ramey where they had gotten the coins. Morris responded that "he had won those playing beer pong with his friends." (Tr. 215).

[6] A couple of days later, Whitney was still suspicious about the source of the coins. Whitney had the password for Ramey's Facebook account, so she looked at Ramey's Facebook page and saw that Ramey had sent messages relating to burglarizing the Cutcher's house. Whitney then went to the Franklin County Sheriff's Department to report Ramey's involvement in the burglary and gave the Facebook messages to Officer Ryan McQueen ("Officer McQueen"). Whitney told the officer about Ramey and Morris's trip to the store to exchange coins for cash and informed him that the store had a surveillance system that would show them walking in the store.

[7] Officer McQueen confirmed that a burglary had occurred at the Cutcher's house and obtained the store's surveillance footage, which showed Morris and Ramey walking into the store with the piggy banks. The officer then arrested and interviewed Ramey, who admitted to committing the burglary with Morris. Thereafter, Officer McQueen interviewed Morris, who admitted that he took

the piggy banks to the store with Ramey but denied being involved in the burglary of the house.[2]

[8] The State subsequently charged Morris with Class B felony burglary and alleged that he was an habitual offender. The trial court held a two-day jury trial on October 5-6, 2015. During voir dire, one of the potential jurors stated that his house, as well as four or five other houses, had been burglarized around the same time as the alleged burglary in this case and that the police had never discovered who had committed these crimes. Thereafter, the prosecutor asked the jury venire if anyone else had been a victim of a crime, and two other potential jurors stated that they knew of people whose houses had been burglarized. In each of these instances, the prosecutor questioned whether these potential jurors could be fair and impartial.

[9] When Morris's counsel questioned the potential jurors, he brought up the existence of the unsolved burglaries on more than one occasion and asked the jurors whether those would weigh on their minds and whether they would "take [it] out" on or penalize Morris. (Tr. 52). Morris's counsel also stated that the prosecutor did not get to make the call of who is guilty or innocent despite the fact that he had "been in office for a long time, years and years." (Tr. 42).

[10] During the trial, the State presented, among its witnesses, Ramey, who had already pled guilty to the burglary, and Whitney. They testified regarding the

---

[2] The officer's interview with Morris was videotaped. Neither party offered it into evidence at trial.

facts above, and Ramey specifically testified that Morris was involved with the burglary of the Cutcher's house. The State also introduced a photograph of the surveillance video, which showed Morris and Ramey entering the store with the stolen piggy banks.

[11] Morris's defense at trial was that, other than Ramey's testimony, there was no physical evidence, such as fingerprints or DNA, to prove that he was present at the Cutcher's house during the burglary. Morris presented one witness, Officer McQueen, who confirmed that his interview with Morris had been recorded.

[12] During the State's closing argument, when discussing the evidence relating to the charged burglary, the prosecutor revisited the voir dire topic of unsolved burglaries. The prosecutor pointed out that, initially, the burglary at the Cutcher's house had also been unsolved and that it was later solved only because Ramey's sister, Whitney, had gone to the police with information. Specifically, the prosecutor stated:

> How did this case get resolved[?] It happened on April the 2nd. On April the 6th, it was solved. How was it solved? One of the defendant's own sister, Whitney Ramey, you heard her testify . . . . She turned in her own sister . . . On April the 2nd the burglaries [sic] committed. Didn't no [sic] who did it . . . and as you found out from the jury selection, you may not know one of five people, statistics show that somebody . . . one to five persons are going to have their home burglarized. I think that showed in our jury selection. *How many people had their home burglarized right in our own county. Do they get away, I don't know. They all don't get solved, but in this one what happened.* After the burglary, they went to Woodruff's in Liberty. Tiffany Ramey had worked their prior to that for some years, and Whitney Ramey still worked there.

Walked in with two piggy banks, you will see this when you back . . . this is in evidence so you'll get to view it back there. This is what was entered into evidence.

(Tr. 325-26).[3] Morris did not object to the prosecutor's closing argument. The prosecutor then continued to discuss the evidence presented during trial.

[13] Thereafter, when the prosecutor discussed Ramey's testimony and Morris's attacks on her credibility, he stated:

You want to disregard [Ramey's] testimony. If you look . . . if Tiffany Ramey had not cooperated . . . had she not cooperated, would we still be able to make this case. I would of [sic]. I'm the Prosecutor, I've been in this county for to [sic] many . . . maybe to [sic] many years for you folks. I have for so long. But yes, I would have prosecuted that based on those text message[s], and this video at Woodruff's and Whitney's testimony. You bet I would of [sic]. Because people that know me, know that if there's a law broken[,] I'll enforce it. If there's a crime committed, I'll prosecute.

(Tr. 332-33). Morris's counsel then objected, stating:

Judge, I'm going to object at this point. I'm going to ask that . . . those comments be stricken from the record. It's improper for the State to vouch from some sort of personal standpoint for the strength of the case. And I . . . would ask that the jury be admonished to disregard those statement [sic] and that the State be . . . admonished to refrain from further statements like that in the future.

---

[3] Morris argues that only the italicized portion of the prosecutor's closing argument constituted prosecutorial misconduct.

(Tr. 333).  The trial court responded:

> Uh, well, it's closing argument of counsel, and they can believe
> or disbelieve [the prosecutor's] characterization of his tenure as
> prosecutor, but to the extent members of the jury that [the
> prosecutor] believes in his case[] [y]ou ultimately have the final
> say about whether you also share that belief.  So, I would just
> indicate that both parties are . . . passionate about why they're
> here.  And [prosecutor] you can be back to your argument, and
> we'll move on.

(Tr. 333-34).

[14]  During Morris's closing argument, his counsel also discussed the unsolved
burglaries in the county, arguing that the jury should not be "so desperate to
solve a burglary" that they "take the word of a burglar, of a thieve [sic], of a
liar, of a person who takes advantage of the people that make it possible for her
to have a pay check . . . , of a person whose own sister surreptitiously monitors
her social media accounts."  (Tr. 344-45).  His counsel then questioned, "Are
we that desperate to solve a burglary in Franklin County?"  (Tr. 345).

[15]  Additionally, Morris's counsel questioned the State's decision on what it had
and had not presented as evidence during trial, stating:

> [W]here's the video statement of Octavius Morris?  Where is it?
> State didn't offer it, they just asked selective questions of Officer
> McQueen.  Did they ask him if he did it?  No, they didn't ask
> that.  Who did, me . . . You've not been allowed to see the
> statement, the audio and video recorded statement, you've not
> been allowed to see it.

(Tr. 345-46). The State objected to Morris's counsel statement, arguing that counsel was "mis-characterizing" by telling the jury that it was not allowed to see that evidence because the videotaped interview had not been offered by either party. (Tr. 346). The trial court agreed that it was a "mis-statement to the extent that the Court [ha]d not exclude[d] it from evidence." (Tr. 346).

[16] During the State's rebuttal argument, the prosecutor addressed Morris's argument about the absence of the videotaped interview from evidence:

> The State goes with what it has, presents its evidence, and he wants to think like we're hiding something. You didn't hear the tape from the defendant, put it in, I don't care. Anybody can ask to put it in[.] Judge didn't rule on it because nobody offered it. He wants you to think what's [going] on there. Believe me, you saw how he represented his client. *If there's something on there and he wants you to hear it, you'd [have] heard it. So don't fall for that, it's an old trick.*

(Tr. 359-60).[4] Morris did not object to the prosecutor's rebuttal argument. In its final jury instructions, the trial court instructed the jury that the attorneys' arguments were not evidence.

[17] The jury found Morris guilty as charged, and he admitted that he was an habitual offender. The trial court sentenced Morris to an aggregate sentence of

---

[4] Morris argues that only the italicized portion of the prosecutor's rebuttal argument constituted prosecutorial misconduct.

thirty (30) years with twenty (20) years executed and ten (10) years suspended to probation.[5]  Morris now appeals.

# Decision

[18]  The sole issue that Morris raises on appeal is a claim of prosecutorial misconduct.  Specifically, he points to three comments made by the prosecutor during closing arguments—only one of which he objected to—and argues that the cumulative effect of these three comments constituted prosecutorial misconduct and fundamental error.

[19]  Our Indiana Supreme Court has explained the relevant standard of review for a claim of prosecutorial misconduct when a defendant has both properly preserved the issue by objecting and when he has waived the issue by failing to object at trial.

> In reviewing a claim of prosecutorial misconduct properly raised
> in the trial court, we determine (1) whether misconduct occurred,

---

[5] During the sentencing hearing, the trial court stated that it was imposing a ten (10) year sentence for Morris's Class B felony burglary conviction as well as a separate and consecutive twenty (20) year sentence with ten (10) years suspended to probation for Morris's habitual offender determination.  Additionally, the original sentencing order, amended sentencing order, and chronological case summary indicate that the trial court imposed a separate twenty (20) year sentence for Morris's habitual offender finding and ordered that it be served consecutively to his burglary conviction.  It is well settled that an "habitual offender finding does not constitute a separate crime nor does it result in a separate sentence, rather it results in a sentence enhancement imposed upon the conviction of a subsequent felony." *Hendrix v. State*, 759 N.E.2d 1045, 1048 (Ind. 2001) (citing *Greer v. State*, 680 N.E.2d 526, 527 (Ind. 1997); *Pinkston v. State*, 436 N.E.2d 306, 307-08 (Ind. 1982)).  Therefore, we remand to the trial court with instructions to correct the sentencing order, abstract of judgment, and chronological case summary to reflect that the twenty (20) year habitual offender enhancement serves as an enhancement of Morris's Class B felony burglary sentence.  The record on appeal does not contain a copy of the abstract of judgment; thus, we do not know how the trial court set forth the sentence in that document.  If the abstract of judgment contains the same irregularity, we further instruct the trial court to correct that document as well.

and if so, (2) "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006), *quoted in Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. *Mahla v. State*, 496 N.E.2d 568, 572 (Ind. 1986)[, *reh'g denied*]. "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Cooper*, 854 N.E.2d at 835 (emphasis added) (citations omitted). To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial. *Id.; see also Maldonado v. State*, 265 Ind. 492, 498, 355 N.E.2d 843, 848 (1976).

Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, that is, *waived* for failure to *preserve* the claim of error. *Booher v. State*, 773 N.E.2d 814, 817-18 (Ind. 2002). The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. *Id.* at 818. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002), *quoted in Castillo*, 974 N.E.2d at 468 and *Cooper*, 854 N.E.2d at 835. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and

(b) "present an undeniable and substantial potential for harm." *Id.* The element of such harm is not established by the fact of ultimate conviction but rather "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." *Townsend v. State*, 632 N.E.2d 727, 730 (Ind. 1994) (quoting *Hart v. State*, 578 N.E.2d 336, 338 (Ind. 1991)). In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible. *See Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002)[, *reh'g denied*]; *Townsend*, 632 N.E.2d at 730; *see, e.g.*, *Castillo*, 974 N.E.2d at 469 n. 11 (noting closing arguments are perceived as partisan advocacy).

We stress that "[a] finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or she should have. . . ." *Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012). Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error. *See Baer v. State*, 942 N.E.2d 80, 99 (Ind. 2011) (noting it is "highly unlikely" to prevail on a claim of fundamental error relating to prosecutorial misconduct)[, *reh'g denied*]; *Stevens v. State*, 691 N.E.2d 412, 420 n. 2 (Ind. 1997)[, *reh'g denied, cert. denied*]; *Wilson v. State*, 222 Ind. 63, 83, 51 N.E.2d 848, 856 (1943).

*Ryan v. State*, 9 N.E.3d 663, 667-69 (Ind. 2014) (footnotes omitted) (emphasis in original), *reh'g denied*.

[20] On appeal, Morris challenges three statements the prosecutor made in the State's closing and rebuttal arguments. Specifically, Morris contends that the prosecutor engaged in misconduct by: (1) suggesting the jury should convict Morris for reasons other than guilt when the prosecutor referenced the unsolved burglaries in the county; (2) improperly vouching for the strength of the State's case and expressing a personal opinion when he stated that he would have prosecuted the case even without Ramey's testimony; and (3) demeaning defense counsel by saying that counsel was using an "old trick." (Morris's Br. 11). Morris did not object to comments (1) and (3). For comment (2), to which he did object, he sought an admonishment only and not a mistrial. Therefore, Morris must establish not only the grounds for prosecutorial misconduct (i.e., misconduct and grave peril), but he must also establish that the prosecutorial misconduct constituted fundamental error. *See Ryan*, 9 N.E.3d at 667-68.

[21] We first address Morris's contention that the prosecutor suggested to the jury that they should convict Morris for reasons other than his guilt when he commented on the unsolved burglaries in the county. Our Indiana Supreme Court has explained that "[i]t is misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt." *Ryan*, 9 N.E.3d at 671 (quoting *Cooper*, 854 N.E.2d at 837).

[22] Morris contends that the following statement by the prosecutor was a request for the jury to convict Morris for reasons other than his guilt and constituted prosecutorial misconduct: "How many people had their home burglarized right

in our own county. Do they get away, I don't know. They all don't get solved, but in this one what happened." (Tr. 325).

[23] We find Morris's argument without merit. As set forth in the Facts section above, the prosecutor revisited the voir dire topic of unsolved burglaries during the State's closing argument when he was discussing the evidence relating to the charged burglary. The prosecutor pointed out that, initially, the burglary at the Cutcher's house was also unsolved and that it was later solved only because Ramey's sister, Whitney, went to the police with information. From a review of the record, we cannot agree with Morris's assertion that the prosecutor was asking the jury to convict Morris of the burglary of the Cutcher's house because there were other unsolved burglaries in the county. Indeed, when viewing the full context of the prosecutor's statements, the prosecutor asked the jury to convict Morris because he was guilty of the burglary based on the evidence presented during trial. Therefore, the prosecutor did not engage in misconduct. *See Hollowell v. State*, 707 N.E.2d 1014, 1024 (Ind. Ct. App. 1999) (explaining that in judging the propriety of the prosecutor's remarks, we consider the statement in the context of the argument as a whole). Furthermore, Morris has not shown that the prosecutor's comment resulted in grave peril, especially where his counsel also referenced the unsolved burglaries during his closing argument. Accordingly, he has not established prosecutorial misconduct. *See Ryan*, 9 N.E.3d at 667 (explaining that a claim of prosecutorial misconduct involves both a showing that the prosecutor engaged in misconduct *and* that the misconduct placed the defendant in a position of grave peril).

[24]     Next, we turn to Morris's second assertion of prosecutorial misconduct. He argues that the prosecutor "improperly vouched for the strength of the State's case and voiced his personal opinion of the case when he told the jury he would have prosecuted the case even without [Ramey's] testimony." (Morris's Br. 13). Specifically, Morris challenges the following statement of the prosecutor:

> You want to disregard [Ramey's] testimony. If you look . . . if Tiffany Ramey had not cooperated . . . had she not cooperated, would we still be able to make this case. I would of [sic]. I'm the Prosecutor, I've been in this county for to [sic] many . . . maybe to [sic] many years for you folks. I have for so long. But yes, I would have prosecuted that based on those text message[s], and this video at Woodruff's and Whitney's testimony. You bet I would of [sic]. Because people that know me, know that if there's a law broken[,] I'll enforce it. If there's a crime committed, I'll prosecute.

(Tr. 332-33). Morris's counsel objected, arguing that the State was improperly vouching for the strength of its case, and he asked for an admonishment "to refrain from further statements like that in the future." (Tr. 333). The trial court admonished the jury that it could can "believe or disbelieve [the prosecutor's] characterization of his tenure as prosecutor" and reminded the jury that it had "the final say" about whether it shared in the prosecutor's belief about the strength of the State's case. (Tr. 333). Morris did not seek a mistrial.

[25]     Morris contends that the prosecutor's statement constituted misconduct, alleging that it violated Indiana Rule of Professional Conduct 3.4(e), which provides:

A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or *state a personal opinion as to the justness of a cause*, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused[.]

[26] (Emphasis added). Morris, however, has not shown, let alone alleged, that the prosecutor's statements placed him in grave peril. Accordingly, we conclude that he has not established prosecutorial misconduct in this instance. *See Ryan*, 9 N.E.3d at 667.

[27] Morris's third allegation of prosecutorial misconduct is that the prosecutor improperly demeaned defense counsel when the prosecutor made the following statement during the State's rebuttal argument:

> The State goes with what it has, presents its evidence, and he wants to think like we're hiding something. You didn't hear the tape from the defendant, put it in, I don't care. Anybody can ask to put it in[.] Judge didn't rule on it because nobody offered it. He wants you to think what's [going] on there. Believe me, you saw how he represented his client. *If there's something on there and he wants you to hear it, you'd [have] heard it. So don't fall for that, it's an old trick.*

(Tr. 359-60).[6] Morris contends that the prosecutor committed misconduct when he "argued that defense counsel's questioning of the State's presentation of the case was an 'old trick.'" (Morris's Br. 11).

[28] "'[C]omments that demean opposing counsel, especially in front of a jury, are inappropriate[.]'" *Ryan*, 9 N.E.3d at 669 (quoting *Marcum v. State*, 725 N.E.2d 852, 859 (Ind. 2000), *reh'g denied*). However, our Indiana Supreme Court has explained that not all allegedly improper comments made by prosecutors will result in a finding of misconduct. *See id.* "'Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable.'" *Id.* (quoting *Cooper*, 854 N.E.2d at 836).

[29] Here, we find our supreme court's opinion in *Ryan* to be instructive. In that case, our supreme court held that a defendant had failed to show prosecutorial misconduct where "the prosecutor used her rebuttal to respond to defense counsel's closing argument" and argued that defense counsel had used a "classic defense attorney trick." *Id.* at 669, 670. In the defendant's closing argument, defense counsel had compared the defendant's case to some false accusation cases in the media and questioned the quality of the police investigation. *Id.* at 670. The *Ryan* Court explained that while the prosecutor's

---

[6] Morris argues that only the italicized portion of the prosecutor's rebuttal argument constituted prosecutorial misconduct.

characterization of defense counsel's argument as a "trick" was inconsistent with one of the requirements in the preamble of the Indiana Professional Conduct Rules ("that lawyers 'demonstrate respect for the legal system and for those who serve it, including . . . other lawyers'"), there had been no prosecutorial misconduct because the defendant had "failed to establish that, under all of the circumstances, such improper comments placed him in a position of grave peril to which he would not have been subjected otherwise." *Id.* (citing Preamble [5], Ind. Professional Conduct Rules; *Cooper,* 854 N.E.2d at 835; *Marcum,* 725 N.E.2d at 859-60).

[30]    Here, like in *Ryan*, the prosecutor's challenged statement was made in response to Morris's defense counsel's closing argument. Specifically, the prosecutor's statement was made in response to defense counsel's challenge to why the State had not introduced the videotape of Morris's police interview and counsel's argument that the jury had "not been allowed to see it." (Tr. 346). Additionally, like the defendant in *Ryan*, Morris has failed to establish that, under all of the circumstances, the prosecutor's response to Morris's closing argument had a probable persuasive effect on the jury's decision or placed him in a position of grave peril to which he would not have been subjected otherwise. As a result, he has failed to establish prosecutorial misconduct. *See, e.g.*, *Ryan*, 9 N.E.3d at 670; *Cooper*, 854 N.E.2d at 836 (explaining that "[p]rosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable"); *Marcum,* 725 N.E.2d at 859-60 (holding that the defendant was not entitled to

relief on his claim of prosecutorial misconduct because he had not established that the alleged comments by the prosecutor placed him in grave peril); *Brock v. State*, 423 N.E.2d 302, 304-05 (Ind. 1981) (holding that the "prosecutor's statement that defense counsel was 'pulling the most low life tricks in this case,' was improper but did not place the defendant in grave peril").

[31] Morris acknowledges that each of the three comments made by the prosecutor "standing alone may not have been sufficient to constitute reversible error[,]" and he argues only that the cumulative effect of the prosecutor's alleged misconduct constituted fundamental error and made a fair trial impossible. (Morris's Br. 13). When reviewing such a claim, we are mindful of our Indiana Supreme Court's observation that fundamental error in this context is "an extremely narrow exception." *Ryan*, 9 N.E.3d at 668. Our supreme court has also "stress[ed] that '[a] finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or she should have. . . .'" *Ryan*, 9 N.E.3d at 668 (quoting *Whiting*, 969 N.E.2d at 34). In order for prosecutorial misconduct to constitute fundamental error, the alleged misconduct must have made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process that presented an undeniable and substantial potential for harm. *See id.*

[32] However, in order for the cumulative effect of prosecutorial misconduct to make a fair trial impossible, there must be prosecutorial misconduct. Here, with respect to the three allegations of prosecutorial misconduct, we have determined that no prosecutorial misconduct occurred. In light of "all relevant

information given to the jury—including evidence admitted at trial, closing argument, and jury instructions[,]" we conclude that Morris has failed to show that the cumulative effect of the prosecutor's three comments resulted in fundamental error and denied him a fair trial. *See Ryan,* 9 N.E.3d at 668 (explaining that when evaluating the issue of fundamental error, we are to review the alleged misconduct in the context of all that happened at trial and all relevant information given to the jury). Accordingly, we affirm his conviction.

Affirmed and remanded.

Kirsch, J., and Riley, J., concur.