**David Michael GREEN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A05–0612–CR–708.

Court of Appeals of Indiana.

July 27, 2007.

562

Marce Gonzalez, Jr., Merrillville, IN, Samuel L. Cappas, Highland, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant David Michael Green ("Green") appeals his convictions and sentences for two counts of Murder, a felony.[1] We affirm.

### Issues

Green presents three issues for review:

I.  Whether the State presented sufficient evidence to negate Green's claims of self-defense and accident;

II. Whether the trial court properly admitted Green's pretrial statement to police into evidence; and

III. Whether the imposition of consecutive sentences is inappropriate.

1. Ind.Code § 35–42–1–1.

2. Stacy's autopsy listed three causes of death: "Laceration of neck due to a stab wound,

### Facts and Procedural History

On November 2, 2004, Green visited his estranged wife Stacy and their two children, E.G. and R.G., at Stacy's home in Griffith, Indiana. Stacy was thirty-nine weeks pregnant with the couple's third child, whom she had named Nathaniel.

After the children were in bed, Green and Stacy walked into the kitchen and Stacy began to clean up the remains of the evening meal. Green decided to confess that he had been involved with another woman. At some point, Green kicked Stacy several times, lacerating her liver. He then strangled her, apparently with an aluminum broomstick, and stabbed her in the neck with a knife. Stacy sustained a two-inch wide, four-inch deep laceration to her neck, which severed her right carotid artery and fractured her cervical vertebrae. Stacy and her unborn son both died.[2]

Green washed his arm, and washed and dried the knife and placed it into a kitchen drawer. He drove to a convenience market to buy Gatorade, and then drove to the residence of Sarah Dechene ("Dechene"), where he spent the night. The next morning, Green telephoned Stacy's home and spoke with his five-year-old son E.G. E.G. told Green that Stacy was lying in "cherry juice next to a broom." (Tr. 215.) Green summoned the police. When the police officers arrived, they found Stacy dead on her kitchen floor next to a bloody and broken aluminum broomstick. A kitchen window was open and the screen had been cut.

In Green's initial conversations with police, he first omitted any discussion of an altercation and later denied that there had extensive chest and abdominal injuries due to blunt force trauma, [and] strangulation of neck." (State's Ex. 139.)

been an altercation. Eventually, Green reported that "something bad has happened" and that he "needed to tell" the officers about it after speaking with his father. (Tr. 458.) After speaking with his father, Green did not answer further police questions.

On November 16, 2004, Green agreed to speak with the police. He did so after receiving written assurances from the Lake County Prosecutor that the State would not seek to have the death penalty imposed upon him if he were ultimately charged with Stacy's and Nathaniel's murders. During the interview, Green admitted that he had been involved in an altercation with Stacy. He stated that Stacy had become angered upon learning of his affair with Dechene, and had come after him with a knife. He claimed that he put his arm around Stacy's neck and squeezed until he felt something pop, but he didn't know how she had been stabbed. He denied having the knife in his hand prior to picking it up to clean it.

On November 17, 2004, the State charged Green with two counts of murder. On August 9, 2006, the trial court denied Green's motion to suppress his November 16, 2004 statement to police. On August 18, 2006, a jury found Green guilty as charged.

On September 22, 2006, the trial court sentenced Green to two consecutive terms of forty-five years imprisonment. He now appeals.

### Discussion and Decision

*I. Claims of Self–Defense or Accident*

At trial, the State presented evidence that Stacy was beaten until her liver was lacerated. She was strangled, stabbed, and sustained a severed carotid artery. Green admitted he was the person alone with Stacy before she died, but now contends that the State failed to negate his alternative claims of self-defense or accident.

A valid claim of self-defense is legal justification for an otherwise criminal act. *Birdsong v. State*, 685 N.E.2d 42, 45 (Ind.1997). The defense is defined in Indiana Code Section 35–41–3–2(a):

A person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:

(1) is justified in using deadly force; and

(2) does not have a duty to retreat;

if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

When a defendant raises a claim of self-defense, he is required to show three facts: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or serious bodily harm. *Wallace v. State*, 725 N.E.2d 837, 840 (Ind.2000). Once a defendant claims self-defense, the State bears the burden of disproving at least one of these elements beyond a reasonable doubt for the defendant's claim to fail. *Miller v. State*, 720 N.E.2d 696, 700 (Ind.1999). The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Id.* Whether the State has met its burden is a question of fact for the factfinder. *Id.* The trier of fact is not precluded from finding

that a defendant used unreasonable force simply because the victim was the initial aggressor. *Birdsong*, 685 N.E.2d at 45.

The standard on appellate review of a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wallace*, 725 N.E.2d at 840. We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

The evidence negating Green's claim of self-defense is as follows. Stacy sustained grave injuries of multiple types, while Green displayed no signs of injury. Although Green claimed that Stacy held the knife, the coroner observed no blood on her hands, palms, or fingers.

Green took painstaking steps to conceal Stacy's death. He washed the knife, dried it, and placed it into a drawer. He returned to Dechene's home and told her that he had dinner with his mother. He placed a call to Stacy's home the next morning, ostensibly to inquire as to her whereabouts. There is evidence that a window was left open and the screen cut, yet the damp leaves on the ground beneath the window were undisturbed. From this, the jury could infer that Green attempted to create the impression that an intruder attacked Stacy.

Finally, Green had given conflicting versions of the incident soon thereafter, alternately claiming that he had no altercation with Stacy, and that Stacy, nine months pregnant, was the aggressor in an altercation from which he could not retreat.

From this evidence, the factfinder could have reasonably rejected Green's claim of self-defense. It is also sufficient to permit the jury's rejection of a claim by Green

that Stacy could have accidentally fatally stabbed herself in the neck without Green's knowledge.

## II. Police Statement

On November 16, 2004, Green and Lake County Prosecutor Bernard Carter signed an agreement providing that the State would not pursue the death penalty against Green (if charged) in exchange for Green's statement regarding the events that culminated in Stacy's death. Green now contends that the admission at trial of his pretrial statement to police was in violation of Indiana Evidence Rule 410, which provides in relevant part:

> [E]vidence of a plea of guilty or admission of the charge which was later withdrawn, or a plea of nolo contendere, or of an offer so to plead to the crime charged or any other crime, or of statements made in connection with any of the foregoing withdrawn pleas or offers, is not admissible in any civil or criminal action, case or proceeding against the person who made the plea or offer.

Generally, statements made by a defendant as part of plea negotiations are not admissible in the trial of the charge following a plea of not guilty. *Chase v. State*, 528 N.E.2d 784, 786 (Ind. 1988). However, statements made by a person prior to the existence of any charge against him to a police officer who lacks authority to enter into a binding agreement are not part of the plea bargaining process. *Id.* The plea bargaining process does not commence until persons having the authority to make a binding agreement have agreed to negotiate. *Id.* "There must be an agreement, a meeting of the minds, *after* the leveling of a felony or misdemeanor charge, to enter into plea negotiations." *Id.* (emphasis added.)

Accordingly, to qualify as a privileged communication, a statement

must meet two requirements: (1) the defendant must have been charged with a crime at the time of the statement, and (2) the statement must have been made to someone with authority to enter into a binding plea agreement. *Gilliam v. State,* 650 N.E.2d 45, 49 (Ind.Ct.App.1995) (citing *Martin v. State,* 537 N.E.2d 491, 493 (Ind. 1989)), *trans. denied.* Whether the parties were engaged in plea negotiations is a question of fact for the trial court, and we review the trial court's decision only for clear error. *Id.*

■ In ruling upon Green's motion to suppress, the trial court found that Green's statement was not privileged because it was not made while the parties were engaged in plea negotiations. The record reveals that Green had not been charged with any crime when he made the statement at issue. He was not then faced with the prospect of entering a plea. Although Green made a bargain, and received the benefit of that bargain, it was not within the parameters of plea negotiations. The admission of Green's statement was not clearly erroneous.

### III.   Consecutive Sentences

Finally, Green requests that we exercise our independent review of sentences to find that the imposition of consecutive sentences is inappropriate. At the time of the instant murders, Indiana Code Section 35–50–2–3 provided that a person convicted of murder could be imprisoned for a fixed term of fifty-five years, with not more than ten years added for aggravating circumstances or not more than ten years subtracted for mitigating circumstances.[3] Indiana Code Section 35–50–1–2 permitted the trial court to determine

whether the terms of imprisonment should be served concurrently or consecutively by considering aggravating and mitigating circumstances. Green received the minimum forty-five year sentences upon the trial court's determination that the mitigating circumstances outweighed the aggravating circumstances. The trial court then ordered the sentences to be served consecutively, stating that any of several aggravators would support the consecutive sentences. Green argues that only concurrent sentences may be imposed in such circumstances.

Green relies upon *Marcum v. State,* 725 N.E.2d 852 (Ind.2000). In *Marcum,* the Court determined that, where the aggravating and mitigating circumstances are in balance, "there is no basis on which to impose consecutive sentences." *Id.* at 864. Subsequently, in *Wentz v. State,* 766 N.E.2d 351 (Ind.2002), the Court remanded with instructions to the trial court to impose concurrent sentences for all counts where the trial court had "twice stated the mitigating and aggravating factors were in balance." *Id.* at 359.

Here, the trial court found in mitigation that Green had no history of delinquency or criminal activity and the circumstances of the crimes were unlikely to reoccur. It is unclear whether the trial court found remorse as a mitigator, because the trial court stated that Green "expressed remorse" but the trial court also observed that Green "maintain[ed] that the death of Stacy Green and Nathaniel Green was an accident." (Tr. 999.) It is also unclear whether the trial court intended to mitigate the sentence because Green experienced a mental "disassociation" after the crime.[4] The trial court spoke of "credible

---

3.   Indiana Code Section 35–50–2–3 now provides that one convicted of a murder committed on or after April 25, 2005 shall be imprisoned for a fixed term of between forty-five

and sixty-five years, with the advisory sentence being fifty-five years.

4.   Dr. Elgan Baker, a clinical psychologist, also referred to the condition as "traumatic

evidence presented to the jury, which this Court does accept to a certain degree, that the defendant did, in fact, dissociate [sic]," but then the trial court went on to say "I have great difficulty and cannot explain the ripped screen in the kitchen—although it may be of no consequence, it may be of consequence, I just don't know." (Tr. 1002.)

■ The trial court found in aggravation that Green "knowingly committed this offense within the hearing of [E.G. and R.G.]." (Tr. 999–1000.) Indicating that it was "in further aggravation," the trial court also commented at length upon the particular circumstances of the crime, including the facts that Green left Stacy "lying on the floor, in a pool of blood, ... wiped the knife in the sweatshirt of Stacy Green on her chest, washed the knife, put the knife back in the drawer, washed blood off of himself, did not call '911' and went to his girlfriend's house in the State of Illinois." (Tr. 1000.) After commenting that the worst sentences were to be reserved for the worst offenders, the trial court stated "the mitigating factors outweigh the aggravating factors" and imposed the minimum sentences. (Tr. 1003.) The trial court then ordered that the sentences be served consecutively, stating in relevant part "I am exercising this discretion, number one, because murder is, in fact, a crime of violence" and "that each aggravating factor found by this Court, taken alone, independently, by itself, is enough to justify the consecutive sentence that I did in fact, impose here today." (Tr. 1003.)

■ In essence, we are confronted with a sentencing statement that is unclear as to the precise mitigators or aggravators found, and is internally inconsistent in that the trial court proclaims that the mitigators outweigh the aggravators for the

amnesia." (Tr. 694.)

purpose of imposing underlying sentences, but then determines that "each aggravating factor found" would adequately support the imposition of consecutive sentences. We must conclude that the trial court erred as a matter of law in stating that mitigators outweighed aggravators when the mitigators were not clearly delineated and supported by the record. Where we find an irregularity in the trial court's sentencing decision, we may (1) remand to the trial court for a clarification or new sentencing determination, (2) affirm the sentence if the error is harmless, or (3) reweigh the proper aggravating and mitigating circumstances independently at the appellate level. *Merlington v. State,* 814 N.E.2d 269, 273 (Ind.2004). Rather than remand, we will proceed to conduct our independent review under Indiana Appellate Rule 7(B), as Green has requested.

■ Under Indiana Appellate Rule 7(B), this "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." A defendant " 'must persuade the appellate court that his or her sentence has met this inappropriateness standard of review.' " *Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind.2007) (quoting *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006)).

■ With respect to Green's character, it is true that he had led a law-abiding life. Such is expected from the general population. He did not demonstrate that he suffered from a mental illness. To the extent that Green may have "disassociated," this took place only after the commission of the crimes, according to the explanation of his expert witness. Thus, the "disassociation" or "traumatic amnesia"

does not in any way mitigate his culpability during the acts that resulted in Stacy's and Nathaniel's deaths. (Tr. 694.) Furthermore, the depths of the "disassociation" did not preclude Green from driving to his girlfriend's house, telephoning his best friend on the way, watching election returns with his girlfriend, and timely reporting for work the next day. As such, it cannot reasonably justify his failure to summon medical assistance. Even if he temporarily lacked memory that he caused Stacy's injuries, it would appear that he was able to observe his environment and respond to it.

With respect to the nature of the offenses, they were committed with heinous and gratuitous violence. Stacy, nine months pregnant, sustained a severed liver from kicks to both her back and her front. She was strangled, attacked with enough force to break an aluminum broom, and stabbed with such force that the knife inflicted a two-inch wide, four-inch deep laceration that fractured her vertebrae. Green left Stacy's body to be discovered by his four and five-year old children, and returned to the home of his girlfriend in another state. It would appear that he "staged" a break-in by opening a window and cutting the screen. The next day, he called his five-year-old son and asked to speak to Stacy, necessarily drawing the child's attention to his mother's whereabouts. She was lying in a pool of blood in the kitchen of a small house, a scene inescapable to the children left alone with her.

Our review of the character of the offender and the nature of the offenses as reflected in the record before us suggests that Green's mitigated sentences were inappropriate. Nevertheless, lacking clear statutory or Constitutional authority to revise sentences upward, we are constrained to affirm the forty-five year sentences.

Furthermore, we hold that consecutive sentences are appropriate, inasmuch as there were multiple victims. As our Supreme Court has observed, "consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person." *Serino v. State,* 798 N.E.2d 852, 857 (Ind.2003). We do not believe that the holdings of *Marcum* and *Wentz* should be read so broadly as to encompass any situation in which the trial court uses "the magic words," i.e. "mitigators outweigh aggravators," regardless of contradictory language and internal inconsistencies apparent from a consideration of the sentencing statement as a whole. In sum, *Marcum* and its progeny were not intended to address a sentencing statement that is erroneous as a matter of law.

### Conclusion

The State presented sufficient evidence to negate Green's defenses of self-defense and accident. Green has established no reversible error in the admission of evidence. Finally, he has failed to persuade us that his consecutive sentences are inappropriate.

Affirmed.

SHARPNACK, J., and MAY, J., concur.