## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 23 2018, 8:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Johnus L. Orr,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 23, 2018

Court of Appeals Case No.
77A04-1608-CR-1923

Appeal from the Sullivan Superior Court.
The Honorable Hugh R. Hunt, Judge.
Trial Court Cause No.
77D01-1501-MR-137

**Darden, Senior Judge**

## Statement of the Case

[1] Tiffanie Adams and her unborn child were found dead in a cornfield, in Sullivan County, Indiana, fifty-five days after their initial disappearance. Cell phone records, along with other evidence, implicated Johnus Orr, Tiffanie's

stepbrother, in the crimes. Johnus was charged, tried, and convicted of the murders of both Tiffanie and her unborn child, and he was sentenced to an aggregate term of 120 years imprisonment. He appeals, arguing erroneous admission of evidence, failure to give a proposed jury instruction, insufficient evidence, double jeopardy violations, and sentencing violations. We affirm.

## Issues

Johnus presents the following issues:

I. whether the trial court abused its discretion in admitting certain evidence;

II. whether the trial court abused its discretion in refusing his tendered jury instruction on voluntary manslaughter as a lesser included offense of murder;

III. whether there was sufficient evidence to sustain his convictions;

IV. whether his convictions violated the double jeopardy clause of the Indiana Constitution;

V. whether the trial court abused its discretion in sentencing him; and

VI. whether his sentence is inappropriate in light of the nature of the offenses and his character.

## Facts and Procedural History

Johnus and Tiffanie were stepsiblings. At the time of the crimes, Christina Orr, Tiffanie's mother, was married to Johnus's father, Brian Orr. Prior to her marriage to Brian, Christina had been married to Bruce Adams. Bruce was not Tiffanie's biological father but he married Christina around the time that

Tiffanie was born, and he assumed the responsibility and role as Tiffanie's father. Bruce's home and Brian and Christina's home were within walking distance such that Brian and Christina's home could be seen from Bruce's backyard. Brian and Christina had developed a strained relationship with Bruce, Christina's ex-husband. Also, there was bad blood between the Orr family and Paul Artem McHenry, Tiffanie's ex-boyfriend and the biological father of her unborn child. During the summer of 2013, Johnus had threatened several times to kill or harm Tiffanie, her father Bruce, and Paul.

[4] At the time of the murders, Tiffanie was eight months pregnant and living in Vincennes with her most recent boyfriend, Donald Barron.[1] On November 5, 2014, around 9:00 a.m., Bruce picked up Tiffanie and Donald in Vincennes and drove them to his home in Sullivan. Tiffanie wanted to pick up some baby clothes from individuals who lived in Sullivan.

[5] Shortly after dropping off Tiffanie and Donald at his home, Bruce left to complete an errand. After Bruce left, Tiffanie told Donald that she was going to her mother's (Christina's) house to see if her mother had some pain pills. Tiffanie was addicted to prescription pain pills. Tiffanie had her cell phone with her when she left for her mother's home.

---

[1] Donald Barron was not the biological father of the unborn child. A prior boyfriend, Paul Artem McHenry, was the biological father of Tiffanie's unborn child.

[6] According to Donald, when visiting Christina in the past, Tiffanie never stayed longer than a few minutes at her mother's home. When Tiffanie did not return after about thirty minutes, Donald called her cell phone from Bruce's land-line phone, but Tiffanie did not answer. When Bruce returned home and learned Tiffanie had gone to Christina's home, he called Tiffanie's cell phone several times without receiving an answer.

[7] That same morning, on November 5, 2014, Johnus had prearranged to drive Katrina Fish (then Katrina Savage) to her job in Linton as a favor to her then boyfriend (later, husband), James "Jim" Fish. Jim, who worked at the Vead-Dodd Sawmill in Sullivan, had made the arrangements with Johnus the day before, on November 4, 2014. They agreed that Johnus would first drive Jim to work at the sawmill using Jim's Chevrolet Blazer vehicle (Blazer), then drive back to Sullivan to pick up Katrina and drive her to Linton, and then later return the vehicle to Jim at the sawmill.

[8] Johnus dropped off Katrina in Linton sometime between 7:30 and 7:45 a.m. He then drove back to his home in Sullivan that he shared with his wife, Amber Orr.[2] According to Amber, Johnus left their home around 11:15 a.m. in the Blazer, to go to the sawmill to pick up Jim, who would then drive Johnus back home during Jim's lunch break. Amber expected Johnus back home by 11:35 or 11:40 a.m.

---

[2] Amber Orr filed for divorce in November 2015.

[9] Johnus and Amber shared a single cell phone. On November 5, 2014, Amber had possession of the cell phone at their home.

[10] When Johnus had not arrived at the sawmill by 11:30 a.m., Jim sent a text message to his girlfriend, Katrina, asking if she had seen Johnus. Katrina responded that Johnus had dropped her off in Linton and left. Jim then sent a text message to the cell phone that Johnus shared with Amber. At 11:50 a.m., Jim texted Katrina again and provided her with the following information he had received from Amber: "Amber said [Johnus] isnt [sic] [at home] [sic] she has his phone and she is going to look for him." State's Exhibit A15.

[11] At 11:56 a.m., Amber received a text message from a phone number that she did not recognize. She later learned the text message was sent by Johnus from Tiffanie's cell phone. The text message stated: "JUST GOT TO PHONE [sic] BLAZER NOW BROKE DOWN ON WAY [sic] TELL JIM SORRY." State's Exhibit A19, p. 12. Three minutes later, Amber received another text message from Tiffanie's cell phone: "DID YOU GET MESSAGE?" *Id.* Amber responded by text at 12:00 p.m., asking, "WHO IS THIS?" *Id.* At 12:01 p.m., Amber received a third text message from Tiffanie's cell phone stating: "JONAS [sic] DUH [F***] N BLAZER BROKE DOWN." *Id.* Amber texted at 12:02 p.m.: "NOPE DIDN'T GET MESSAGE [sic] WHERE U AT." *Id.* The fourth text message sent from Tiffanie's cell phone, at 12:03 p.m., stated: "WELL HEADED TO JIM'S WORK [sic] IT DIED ON ME." *Id.*

[12] At 12:03 p.m. Amber received a fifth text message from Tiffanie's cell phone that stated: "JUST TOLD JIM HIS BLAZER BROKE DOWN." *Id*. A sixth text message was received at 12:05 p.m. with the following message: "TELL HIM BOUT [sic] TO HEAD THAT WAY [sic] DAMN THING DIED GOING DOWN ROAD [sic] B THERE SOON GOTTA GIVE PHONE BACK." *Id*. At 12:06 p.m., Amber texted the following to Tiffanie's cell phone: WELL WHERE U AT IM [sic] ON GOLF CART LOOKING FOR YOU."[3] *Id*. At 12:07 p.m., Amber received the following seventh text message from Tiffanie's cell phone: "JUST HEAD HOME [sic] B THERE N FEW BABY [sic] WAS ON BACK ROAD TO LAKE WAY I ALWAYS TAKE." *Id*.

[13] Amber responded by text at 12:08 p.m. the following: "OK I TOLD HIM US [sic] WAS ON UR WAY TO HIM NOW." *Id*. At 12:08 p.m., an eighth text message from Tiffanie's phone to Amber's phone stated: "OK C U N BIT HONEY." *Id*. Amber then replied by text at 12:10 p.m. the following: "WHOS [sic] PHONE IS THIS?" *Id*. At 12:11 p.m., Amber received a ninth text from Tiffanie's phone: "DON'T KNOW THEM [sic] MAN AND WOMAN LET ME TEXT U [sic] GOTTA GIVE BACK NOW SO CAN LEAVE [sic] MAKIN SURE IT STAYED RUNNIN." *Id*.

---

[3] At the time, Johnus and Amber did not own a motor vehicle. They used a golf cart as their means of transportation.

[14] Around 1:00 p.m. on November 5, 2014, Bruce received three phone calls on his land-line phone from Tiffanie's cell phone. When Bruce answered the first call, he heard a man's voice in the background before the call was disconnected. When he answered the second call, he did not hear anything; however, the second call was also disconnected. When Bruce answered the third call, he again heard a male voice yelling in the background. Bruce testified that, during one of the phone calls he "heard commotion" and Tiffanie's voice saying, "dad, dad." Tr. Vol. IV, p. 161. Bruce then placed approximately ten calls to Tiffanie's cell phone. All of his calls to Tiffanie's cell phone were routed to voicemail. The last recorded use of Tiffanie's cell phone was an outgoing call to her mother's (Christina's) phone placed at 1:26 p.m. on November 5, 2014.

[15] Johnus arrived at the sawmill in the Blazer around 1:30 p.m. Johnus told Jim that the Blazer's engine had "died", and he had tried everything to fix it. Tr. Vol. V, p. 56. Johnus then used Jim's cell phone to call Amber. The call was placed at 1:31 p.m. Johnus told Amber he had arrived at the sawmill and asked her to pick him up in their golf cart. Johnus walked approximately one-half mile east, away from the sawmill. Amber picked him up at the intersection of County Road 75 East and County Road 300 North in Sullivan County.

[16] Later that same afternoon, Johnus and Amber went to Brian and Christina's home. An action-activated deer hunting camera was mounted on Brian and Christina's front porch. Bruce was at his home and saw Johnus and Amber arriving at Brian and Christina's home. Bruce testified that he saw Johnus and

Amber later that afternoon tinkering with something on Brian and Christina's front porch.

[17]  The next day, on November 6, 2014, Brian contacted Johnus and told him that the removable memory card was missing from his deer hunting camera. Johnus and Amber returned to Brian's home and installed a replacement memory card in the camera.

[18]  Tiffanie was reported missing on November 7, 2014. Law enforcement efforts to locate her were unsuccessful. Tiffanie's body was eventually discovered on December 30, 2014, by two Sullivan County farmers, in a field where they were belatedly harvesting corn. Her body had decomposed, and animals had disturbed it. A red fleece jacket was knotted around Tiffanie's neck, and a leaf was found within the knot. Tiffanie's cell phone was not found with her body.

[19]  The pathologist conducted an autopsy on December 31, 2014, and determined that the cause of Tiffanie's death was ligature strangulation. At the time of her death, Tiffanie had in her system ethanol at a level of .024 percent, as well as Benadryl. Her body had sustained a broken rib from an unknown cause. The pathologist determined that the fetus Tiffanie carried was viable and, essentially, suffocated due to Tiffanie's death.

[20]  Sullivan County Sheriff Clark Cottom interviewed Johnus about the murders on December 31, 2014, and on January 20, 2015. At the first interview, Johnus claimed that he last saw Tiffanie in September 2014, at the Dollar General store where a family dispute arose and the police were called to the scene. Johnus

told Sheriff Cottom that on the day Tiffanie went missing, he had dropped off Katrina in Linton, using Jim's Blazer, and then drove back toward the sawmill. According to Johnus, Jim's Blazer broke down near County Road 300 North and County Road 75 East, about one mile from the sawmill. Johnus told the sheriff that he had flagged down a car with two strangers in it who offered to "jump" the Blazer. The strangers allowed him to use their cell phone so that he could contact his wife, Amber. Johnus stated that he sent a text message to Amber using the strangers' cell phone. After restarting the Blazer, he allowed it to idle for a few minutes. He then returned the cell phone to the strangers and drove directly to the sawmill. He indicated that the encounter with the strangers lasted approximately twenty minutes. Johnus told the sheriff that when he arrived at the sawmill, he then asked to borrow Jim's cell phone. At that point, he called Amber and told her where to pick him up.

[21]     The sheriff drove his patrol car from the location where Jim's Blazer had allegedly broken down to the sawmill and estimated that it took a little over one minute to cover the distance. Although Tiffanie's cell phone had not been recovered at the time of the interview, the sheriff knew from cell phone records obtained from the cell phone service provider that Tiffanie's cell phone had been in contact with Johnus and Amber's cell phone on the day Tiffanie went missing. At that time, however, the sheriff did not have the word-for-word content of the text messages sent from Tiffanie's cell phone.

[22]     On August 27, 2015, Tiffanie's cell phone was found in Lake Sullivan, approximately one-half mile from where Johnus told Sheriff Cottom the Blazer

had broken down on the day Tiffanie went missing.  All of the text messages on Tiffanie's cell phone, that were sent on the date of her disappearance, had been deleted from her cell phone when it was found.  Later, however, the Indiana State Police Cyber Crimes Unit was able to recover the deleted messages, word-for-word.

[23]  An Indiana State Police Laboratory forensic scientist examined possible evidence collected from Jim's Blazer.  The scientist confirmed that red fibers found in Jim's vehicle "could have originated from the red fleece jacket" that was found knotted around Tiffanie's neck.  Tr. Vol. IV, p. 147.

[24]  On January 21, 2015, Johnus had been charged with two counts of murder, one count for Tiffanie's murder and one count for the murder of her unborn child.  At trial, Federal Bureau of Investigations (FBI) Special Agent Kevin Horan testified for the State as an expert witness in the area of cell phone records data analysis.  Special Agent Horan testified, over Johnus's objection, that he reviewed the call detail records for Tiffanie's cell phone, and the relevant cell tower data, and determined that on the day she went missing, Tiffanie's cell phone communicated with cell towers near where her body was found and near where her cell phone was eventually found in the lake.

[25]  John Cline, who was incarcerated with Johnus from August 2015 through February 2016, also testified as a witness for the State.  He testified that while he and Johnus were in jail watching a television show about a cold-case murder investigation, Cline commented to Johnus that he found it hard to believe that

someone could avoid talking about a crime like that for so long. Johnus responded, "[Y]ou'd be amazed at what you can live with when you have to." Tr. Vol. VI, p. 13. Cline further testified that on another occasion, Johnus indicated that he did not feel sorry about what he did to Tiffanie, but that he felt badly about the baby. Per Cline, Johnus asked Cline if he (Cline) thought that God would forgive him.

[26] At the conclusion of the five-day jury trial, Johnus was found guilty as charged. He was sentenced to sixty years on each murder count, to be served consecutively. Johnus appeals.

# Discussion and Decision

## I. Admission of Evidence

[27] Johnus argues that the trial court abused its discretion in admitting into evidence the following: 1) expert testimony from FBI Special Agent Horan regarding cell phone records analysis as related to the relationship and the location of Tiffanie's cell phone on the day she went missing, 2) evidence that suggested Johnus raped certain family members, and 3) Amber's opinion testimony regarding Johnus's guilt.

[28] Wide discretion is afforded the trial court in ruling on the admissibility and relevancy of evidence. *Smith v. State*, 730 N.E.2d 705, 708 (Ind. 2000). We review evidentiary decisions for abuse of discretion and reverse only when the decision is clearly against the logic and effect of the facts and circumstances. *Id.* "A claim of error in the exclusion or admission of evidence will not prevail

on appeal unless the error affects the substantial rights of the moving party." *McCarthy v. State*, 749 N.E.2d 528, 536 (Ind. 2001).

### A. Expert Testimony

[29] Johnus contends the trial court abused its discretion by permitting the introduction of expert testimony from Special Agent Horan regarding cell phone data and records analysis. According to Johnus, the testimony should have been excluded because the State failed to establish that the testimony rested upon reliable scientific principles, as required by Indiana Evidence Rule 702. Prior to trial, Johnus filed a motion in limine, seeking to exclude the testimony. A hearing was held, after which, the trial court issued an order denying Johnus's motion. Johnus renewed his objection to the testimony at trial.

[30] Testifying as an expert witness for the State at trial, Special Agent Horan first established his credentials. The jury learned that he had been employed by the FBI for twenty years and that, for the last five years he had been a full-time member of the Bureau's Washington, D.C.-exclusively-based Cellular Analysis Survey Team (CAST). CAST members are trained to review detailed cellular call records and to interpret and illustrate the cell towers used by a cell phone during a specified period of time. CAST members initially undergo one month of extensive training and then must continue to take additional educational classes thereafter. Per Special Agent Horan, "[o]ur initial CAST certification school is a month long, as well as additional schools that we have to go to, to become certified as a cell phone expert." Tr. Vol. V, p. 138. The CAST

members are called upon to train law enforcement around the world regarding cell phone technology and record analysis. Horan was one of only twelve full-time members of the exclusive CAST team.

[31] Special Agent Horan testified that he specializes in "what's called Historical Records Analysis," and he explained the analysis as follows:

> So that is taking records that are produced by all of our cell phones, by law all of our phones have to create records. So that is all your text message activity, all your voice calls, all your phone calls, data sessions, so that's the side of your phone that connects with Facebook or email or whatnot. What I can do with those records is I can recreate, for investigations, for courtroom activities, the approximate location of where phones were over a period of time. So we take the records, which in and of themselves are just a bunch of numbers, they don't say anything, but when I look at them and I interpret them I can tell you a story. I can illustrate for you what happened over a period of time. So in this case I was asked to take these records and to come up with an analysis of what was going on with the phone, where it was approximately during the stated period.

*Id*. at 133-34. He further explained that CAST members specialize in "Geo Location, . . . taking record[s] that the [cell] phone produces and we're trying to illustrate where the phone could have been during that period of time." *Id*. at 139. Special Agent Horan stated that he has been recognized and qualified as an expert witness for cell phone record analysis in numerous courts.

[32] Special Agent Horan next explained that cell phones are essentially high-speed radios that communicate with cell towers. He stated that "cell phones do not talk to each other[,] they only talk to one (1) thing and that is a cell tower and

they use radio frequencies to do that." *Id*. at 140. Per Special Agent Horan, most cell towers are designed to cover a 360-degree radius that typically is divided equally into three separate sectors. Each tower has a unique identifier that allows cell providers to determine what specific tower a cell phone communicated with at a particular time. If a cell phone is within the "footprint" of a particular tower ("the actual coverage area of that cell tower"), the phone will select that tower for service. *Id*. at 140, 144. He then discussed a certain field test he performs, known as a "drive test", as part of his analysis of cell phone call records. The test requires:

> specialized gear . . . ; it's a laptop with a scanner and some antennas, and what it does is it measures the signal strength and quality of the [cell] towers it sees. And at the end of the drive test I end up with a footprint of the actual coverage area of the cell tower and that sector. What's important to have a footprint [sic], is that without it we're just estimating the area of coverage, how far out those radio frequencies go, where they cover, what they do. But with a drive test I can say for certain these radio frequencies cover this area or they don't cover this area.

*Id*. at 144.

[33] Special Agent Horan then testified regarding the cell phone analysis he performed for the instant case. He was provided by the State with certain Verizon cell phone call data records associated with Tiffanie's cell phone. He created a written report and a PowerPoint presentation to the jury containing his drive test information, "Range to Tower" data (additional information provided by a cell phone service provider that can show with greater clarity

where a cell phone could have been during a certain period of time), and his analysis and opinions regarding the call data records from Tiffanie's cell phone. *Id.* at 155. Both the report and the PowerPoint presentation illustrated the approximate locations of Tiffanie's cell phone on November 5, 2014, as it communicated with cell towers by way of calls made to and from Tiffanie's cell phone. Based upon his analysis, Special Agent Horan theorized that, around the time Tiffanie went missing, her cell phone traveled south from the area where her body was found and then west (in the direction of the sawmill) to the lake location where her discarded cell phone was later found. Special Agent Horan testified specifically, as follows:

> So, what I was showing you before were three (3) different cell sites, three (3) different sectors that the phone selected during a rather short period of time. So for about a half an hour, a little over half an hour; from 12:53 to 1:26 P.M. So when I look at these records I have to look at it from a much different view because the question I ask is how could the phone have selected three (3) different towers, three (3) different sectors that were significantly apart from one another. Where do they all come together that the phone could have selected all three (3) in the same distance and time? And so what I've done here is I've focused on an area that happens to be where Miss Adams' body was found and also where the phone was found. So starting with the first set of calls, tower forty-three (43) this is the area in pink. From 12:53 to 1:00 it's selecting the area in pink. So it's possible the phone was moving from west to east. It then selects tower three twenty-eight (328) from 1:01 to 1:16, which is this area here in gray, over here, moving from Sullivan, out to the area where the body was found. Moving south and then west, it then selects tower seventy-eight (78) at 1:23 P.M.
>
> . . . .

And then finally it selects tower forty-three (43) again at 1:25 and 1:26 P.M. So again we're back in the pink. So we have three (3) sectors, all colliding in the same general location. So you're talking about a short window of time, about a little over a half an hour. The phone was moving, and we know that because it was selecting different towers during that period of time. So how could it have done that, where would it have been where it could have gotten all three (3) signals during that period of time? And so I've summarized this, this pattern if you will, in this particular slide. Finally this is where the phone was found, near the bridge back into Sullivan. At 1:[2]6, so this is ten (10) minutes after the phone, the very last phone call that was – outgoing call that was made from the phone . . . .

*Id*. at 152-53.

[34]     The admission of expert testimony is governed by Indiana Evidence Rule 702, which provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

Johnus does not claim that Special Agent Horan lacked the necessary qualifications to analyze and offer opinions regarding the cell phone call records. Instead, Johnus's primary contention is that Special Agent Horan's testimony was not based upon reliable scientific principles. Johnus also

contends that the State offered none of the evidence our Indiana supreme court has indicated a trial court could consider when determining whether the challenged evidence was admissible under Indiana Evidence Rule 702(b); that the State presented no evidence as to known or potential error rates other than the agent's concession that the exact location of cell phones cannot be determined through the procedures he used; that the record contains no evidence that Special Agent Horan's theory or technique can be or has been tested; that the record contains no evidence that the theory underlying the cell phone location analysis has been subjected to peer review and publication; and that Special Agent Horan did not prove the source for much of the information he presented at trial.

[35] However, Special Agent Horan's testimony does not appear to be based entirely upon matters of "scientific principles" governed by Indiana Evidence Rule 702(b), but, moreover, rather falls within the area of "specialized knowledge" and "training" governed by Indiana Evidence Rule 702(a). Our supreme court has determined that the "specialized knowledge" set forth in Evidence Rule 702(a) is not necessarily scientific knowledge, and it need not be proven reliable by means of "scientific principles." *Malinski v. State*, 794 N.E.2d 1071, 1085 (Ind. 2003). Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence. *Turner v. State,* 953 N.E.2d 1039, 1050 (Ind. 2011).

[36] Special Agent Horan testified to specialized knowledge and training about whether Tiffanie's cell phone was within the actual coverage area of particular cell towers at particular times based upon his training, education, and experience as a twenty-year veteran of the FBI and a five-year member of a twelve-person team that specializes in cell phone technology and cell phone records data analysis. His testimony was not based solely upon scientific principles or rules. During cross-examination, Johnus elicited testimony from the agent that his opinions were based upon "the best information we have based upon the limitations of technology," and that there was no way to know the exact locations of Tiffanie's cell phone on the date she went missing. Tr. Vol. V, pp. 167-68. As such, the requirements of Indiana Evidence Rule 702 were satisfied. We find that the trial court did not abuse its discretion in allowing Special Agent Horan's testimony.

### B. Rape Evidence

### 1. Evidence Rules 404(b) and 403

[37]  Johnus next argues that the trial court abused its discretion in admitting into evidence, over his objection, his application for a protective order against Tiffanie;[4] a police report that was generated at the time of his request; and the voluntary statements that Johnus provided to the Sullivan City Police Department about matters reflected in the police report. Johnus maintains that

---

[4] The protective order sought by Johnus was never issued.

the documents contained information that suggested he raped certain female family members.[5]

[38] The essential facts are that on September 5, 2014, Johnus and his then wife, Amber, met with Sullivan City Police Department Chief Jesse Morin to request that harassment and false informing charges be filed against Tiffanie and her mother, Christina. Chief Morin documented the meeting in his police report. Per the police report, Johnus told Chief Morin (among other things): that Tiffanie, Christina, and Mary Orr (Johnus's sister) were harassing him and had accused him of raping them; that the allegations of rape were false; that "[he was] not a rapist;" that Tiffanie and Christina had screamed and yelled at him and called him a rapist; and that he wanted the harassment and false accusations to stop. Tr. Vol. IV, p. 209. Johnus's written, voluntary statements that accompanied the police report reiterated that the allegations levied against him were false and that he wanted the harassment to stop. He specifically wrote: "Im [sic] not a rapist[.] I want it all stopped now." State's Exhibit A3. Three days later, Johnus filed an application for a protective order against Tiffanie on the basis of her allegedly touching him, threatening to harm him, and harassing him by falsely accusing him of raping her.

---

[5] Johnus also contends the prejudicial information contained in the documents was reintroduced at trial during the State's direct examination of his then ex-wife, Amber, when the State attempted to elicit testimony from Amber that she divorced Johnus because she believed he murdered Tiffanie. However, Johnus objected and the State abandoned the line of questioning.

[39] At a pre-trial conference, Johnus moved to exclude the documents from evidence. The trial court ruled that the evidence was admissible. At trial, Johnus renewed his objection on grounds that the documents were evidence of other misconduct. The trial court overruled Johnus's objection, and the documents were admitted into evidence. The trial court provided the following limiting instruction to the jury:

> [M]embers of the jury, you are not required to accept anything contained in there as the truth. It's up to you to decide. . . . I also want to advise you Jurors, and I want you to listen very carefully. I'm going to give you what [sic] called a limine instruction, so please listen very carefully to what I tell you. I've allowed this evidence to be introduced at this time, that the Defendant was accused, maybe involved in other, has been accused of other acts, other than the acts that he has been charged with today. This evidence has been allowed in by me for the purpose of ah, addressing or addressed for the issue solely of perhaps the Defendant's motive or the relationship of the parties here. This evidence should be considered by you only for this limited purpose. You are not to let your mind go and drift into areas of whether or not he did these acts. It's only for the limited purpose of motive and the relationship of the parties.

Tr. Vol. IV, pp. 212-13.

[40] On appeal, Johnus argues that the admission of the documents into evidence violated Indiana Evidence Rules 404(b) and 403. Per Johnus, the allegations of rape contained in the documents "constituted allegations of prior, uncharged misconduct for which the prejudicial impact far exceeded its [probative] value." Appellant's Br. p. 23. We disagree.

[41] Evidence Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Ind. Evidence Rule 404(b)(2). When a defendant objects to the admission of evidence on the grounds that it would violate Rule 404(b), the following test is applied: 1) the court must determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and 2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Thompson v. State*, 690 N.E.2d 224, 233 (Ind. 1997). "The well established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the 'forbidden inference' that the defendant had a criminal propensity and therefore engaged in the charged conduct." *Id*.

[42] Here the challenged evidence, specifically, the fact that Johnus sought a protective order against Tiffanie because she allegedly was harassing him and accusing him of rape, was not admitted to prove Johnus's character or that he was a rapist. The evidence was relevant to show possible proof of motive for Johnus to murder Tiffanie and her unborn child. *See Fry v. State*, 748 N.E.2d 369, 372 (Ind. 2001) (evidence of motive always relevant in proof of crime, and defendant's prior actions with respect to victim usually admissible to show relationship between the two).

[43] Regarding whether the probative value of the evidence outweighed any unfair prejudice to Johnus, we find that it does. The incident that led to Johnus seeking the protective order, as documented in the police report, showed that according to Johnus, Tiffanie was harassing him and that a hostile relationship existed between Tiffanie, Christina, and Johnus. The evidence shows that approximately two months after Johnus and Amber's meeting at the Sullivan City Police Department, Tiffanie was murdered. The trial court specifically instructed the jury that it may consider the evidence only for the limited purpose of motive or proof of the relationship between Johnus and Tiffanie, and to not "let your mind go and drift into areas of whether or not [Johnus] did these acts [alleged in the documents]." Tr. Vol. IV, p. 213; *see Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987) (when jury properly instructed, we presume they followed such instructions). The trial court did not abuse its discretion in admitting the evidence to the jury regarding the protective order Johnus had sought against Tiffanie, the police report, and Johnus's own voluntary statements therein.

## 2. Right to Confrontation

[44] Johnus next argues that the admission of the evidence regarding the protective order, the police report, and his voluntary statement constituted inadmissible hearsay and violated his right to confront witnesses under the Sixth Amendment and article I, section 13 of the Indiana Constitution.

[45] The Confrontation Clause of the Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to

be confronted with the witnesses against him." *See Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359, 158 L. Ed. 2d 177 ("We have held that this bedrock procedural guarantee applies to both federal and state prosecutions"). The Confrontation Clause applies to an out-of-court statement if it is testimonial, the declarant is unavailable, and the defendant had no prior opportunity to cross-examine the declarant. *Id*. at 59, 124 S. Ct. at 1369. Article I, section 13 of the Indiana Constitution provides in relevant part: "In all criminal prosecutions, the accused shall have the right . . . to meet the witnesses face to face. . . ."

[46] Johnus voluntarily met with the police chief and provided the alleged facts for him seeking a protective order against Tiffanie. He now challenges the admissibility of the evidentiary documents containing the allegations that he alleges were made by his sister, Mary, that he raped her. He further argues that these allegations were "testimonial"; that he "never had the opportunity to cross-examine his sister"; and that because his sister never testified at trial, the allegations were inadmissible hearsay admitted in violation of his Sixth Amendment right to confrontation. Appellant's Br. p. 39. However, Johnus is mistaken. The evidence that Johnus challenges consists of his own statements, not statements made by his sister, Mary. Specifically, the police report contains the following: "Mr. [Johnus] Orr stated a [sic] Christina Orr (step mother) and Tiffanie Adams (step sister) and Mary Orr (sister) are accusing him of rape . . . ." State's Exhibit A3. Johnus's written voluntary statement provides in relevant part: "Christina Orr, Tiffanie Adams and Mary Orr are accusing me of

rape . . . ." *Id.* Based upon the foregoing, we fail to find a violation of Johnus's right to confrontation under the Sixth Amendment or the Indiana Constitution.

## C. Opinion Testimony

[47] Johnus's next argument is that the trial court committed reversible error by improperly allowing witness opinion testimony in violation of Indiana Evidence Rule 704(b). The rule states in pertinent part that "witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations . . . ." Ind. Evidence Rule 704(b).

[48] During Amber's direct examination, the following testimony was elicited:

> [STATE]: [When you were interviewed by the police] on January 20th, 2015, in that interview you stated that you were gonna stand by your husband at that time, you were gonna stand by him. You believed he was innocent, is that correct?
>
> [AMBER]: Yes.
>
> [STATE]: And you stated that if ah, if at any time you felt that he had killed Tiffanie you would divorce him?
>
> [AMBER]: Yes.

Tr. Vol. V, p. 114. Johnus objected as follows:

> [DEFENSE]: And Your Honor, I'm gonna object. This is completely irrelevant, immaterial and inappropriate.
>
> THE COURT: Where are we going with this Mr. Springer? You make an offer to prove here.

*Id.* Direct examination continued as follows:

[STATE]: You're divorced now correct?

[AMBER]: Yes.

[STATE]: And when did you file for divorce?

[AMBER]: November of [2015].

[STATE]: And did you want to file sooner?

[AMBER]: Yes.

[STATE]: And why didn't you?

[DEFENSE]: Your Honor I'm gonna object [sic] this is completely irrelevant. It has no basis –

THE COURT: Again, Mr. Springer, I'm gonna ask you where you're going with this.

[STATE]: I have no more questions Your Honor.

*Id.* at 115. Per Johnus, Amber's statements at trial violated Indiana Evidence Rule 704(b) "because they constituted opinions concerning [Johnus's] innocence/guilt and the truth or falsity of the allegations against him." Appellant's Br. pp. 41-42.

[49] We find that allowing the continuation of the line of questioning of Amber is problematic under Rule 704(b). However, upon closer review and considering the totality of Amber's testimony, we do not find that it had an adverse impact upon the jury's verdict. Johnus's prompt and continuous objection to the line of questioning prevented Amber from testifying as to her personal opinion as to Johnus's guilt or innocence in the matter. Amber's limited testimony constituted approximately one page of testimony in a six-volume transcript and several days of evidence. The State's case did not rest on Amber's answers to the questions posed by the State. Furthermore, Johnus did not request an

admonishment of the jury; and, additional, substantial evidence was presented at trial that supported Johnus's guilt. To be reversible, opinion testimony must prejudice the defendant. *Taylor v. State*, 689 N.E.2d 699, 706 (Ind. 1997). Johnus has not shown how his substantial rights were violated, nor was he prejudiced by Amber's testimony.

## II. Voluntary Manslaughter

[50] Johnus contends that the trial court erred in failing to give his tendered instruction on voluntary manslaughter. Outside of the presence of the jury, Johnus requested and tendered an instruction on voluntary manslaughter, as a lesser included offense of murder to be given to the jury. The trial court declined to give the instruction, explaining in part:

> I've not heard any evidence with regards to "sudden heat" and because of that I'm not inclined to give that instruction. In fact I think that it would be an error to do that. In essence, there has to be a serious evidentiary dispute between the parties that distinguishes voluntary manslaughter for [sic] murder, "sudden heat." I've not heard any serious evidentiary dispute with regards to that. I've not heard any evidence with regards to sudden heat in this matter. I mean there's been some implications, assertions perhaps, but I've not heard that evidence. So therefore I'm not inclined to give that instruction.

Tr. Vol. VI, p. 30.

[51] Voluntary manslaughter is an inherently included offense of murder. It is murder mitigated by evidence of "sudden heat." *See* Ind. Code §§ 35-42-1-1 (2014) (murder) and 35-42-1-3 (2014) (voluntary manslaughter). A

voluntary manslaughter instruction should be given if there is "appreciable evidence" of sudden heat. *Stevens v. State*, 691 N.E.2d 412, 426 (Ind. 1997). Sudden heat is "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Washington v. State*, 808 N.E.2d 617, 625-26 (Ind. 2004). This standard is an objective one. *See, e.g.*, *Wilson v. State*, 697 N.E.2d 466, 474 (Ind. 1998) (stating sudden heat contemplates an ordinary person, not one afflicted with post-traumatic stress disorder). Words alone are not sufficient provocation. *Matheney v. State*, 583 N.E.2d 1202, 1205 (Ind. 1992). We review the refusal to instruct the jury on voluntary manslaughter for an abuse of discretion. *Washington*, 808 N.E.2d at 626. We will not reverse absent a "serious evidentiary dispute" as to sudden heat. *Wilson*, 697 N.E.2d at 474.

[52] According to Johnus, the use of Tiffanie's own jacket as a ligature, "together with [Johnus's] ongoing feud with [Tiffanie] over her rape claims and [Tiffanie's] desperate search for drugs, suggests that if [Johnus] killed [Tiffanie], it was the product of sudden heat. Appellant's Br. p. 47. We disagree. Although the State's evidence suggested a possible motive for the murders, that being the ongoing feud and animosity that existed between Johnus, Tiffanie, and her family and friends, "[a]nger standing alone is not sufficient to support an instruction on sudden heat." *Wilson*, 697 N.E.2d at 474. In other words, the record is void of any appreciable evidence of sudden heat to support the giving of a voluntary manslaughter instruction.

[53] As a result, there was no evidentiary dispute regarding sudden heat, the mitigating circumstance that distinguishes voluntary manslaughter from murder. The trial court did not abuse its discretion in declining to give a voluntary manslaughter instruction to the jury.

## III. Insufficient Evidence

[54] Johnus argues that the evidence was insufficient to support his convictions for the murders of Tiffanie and her unborn child. According to Johnus, "the State's purely circumstantial evidence was too conflicting and speculative to prove [his] guilt." Appellant's Br. p. 49. Our standard of reviewing claims relating to sufficiency of the evidence is well established. On appeal, we do not weigh the evidence or judge the credibility of witnesses. *Banks v. State*, 567 N.E.2d 1126, 1129 (Ind. 1991). We consider only that evidence most favorable to the verdict together with all reasonable and logical inferences to be drawn therefrom. *Id*. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be disturbed. *Id*. A conviction of murder may be sustained on circumstantial evidence alone. *Green v. State*, 587 N.E.2d 1314, 1315 (Ind. 1992). The reviewing court need not determine that circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but only that an inference may reasonably be drawn which supports the finding of guilt. *Id*.

[55] Orr was charged with knowingly or intentionally killing another human being and with knowingly or intentionally killing a fetus that had attained viability.

*See* Ind. Code § 35-42-1-1. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a) (1977). A person engages in conduct "knowingly" if, "when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). A fetus has attained viability when it has the ability "to live outside the mother's womb." Ind. Code § 16-18-2-365 (1993).

[56] In support of his argument, Johnus maintains that he could not have committed the murders because, among other things, he suffered from severe back problems; he had no marks on his body that would indicate he engaged in a struggle with Tiffanie; tire marks from the Blazer that he drove were not found at the scene of the crime; he was not seen with Tiffanie on the day of her disappearance; the cell phone records evidence established that he did not commit the murders; and certain witnesses reported seeing Tiffanie days after her initial disappearance.

[57] However, the evidence presented at trial showed that on the day she went missing, Tiffanie, eight months pregnant at the time, left her father's home and walked to her mother's home, located nearby. Irrefutable evidence established that on that same day, Johnus had possession and use of a vehicle and was driving to the local sawmill to return the vehicle to the owner and the road to the sawmill took him past Tiffanie's mother's home. Johnus was aware that Tiffanie was pregnant at the time.

[58]    It is undisputed that between 11:56 a.m. and 12:11 p.m. on the day she went missing, several text messages originating from Tiffanie's cell phone were sent to the cell phone that Johnus and his wife, Amber, shared. At the time the messages were sent, Amber was at home and had possession of the shared cell phone. Around 1:00 p.m., three calls were placed from Tiffanie's cell phone to her father's land-line phone. During two of the calls, Tiffanie's father testified that he heard a man's voice in the background, Tiffanie's voice, and then a "commotion." Tr. Vol. IV, p. 161. The last recorded use of Tiffanie's cell phone was an outgoing call to her mother placed at 1:26 p.m. Although Johnus was supposed to arrive at the sawmill before noon, he did not arrive until approximately 1:30 p.m., claiming car trouble for the delay.

[59]    Almost two months later, the bodies of Tiffanie and her unborn child were found dead in a cornfield. She had been strangled with a red fleece jacket and her viable, unborn child suffocated inside her womb when she died. The pathologist who performed the autopsy determined that the fetus was viable, meaning that it could have survived outside of the mother's womb. A forensic scientist confirmed that red fibers found in the Blazer that Johnus was driving "could have originated" from the fleece jacket wrapped around Tiffanie's neck. *Id*. at 147.

[60]    When Johnus was first interviewed by Sheriff Cottom about the murders (on December 31, 2014), he told the sheriff that he could not have committed the crime because he did not own a motor vehicle at the time, and that he and his wife were always together, "day in, day out." Tr. Vol. V, p. 183. In his second

interview with Sheriff Cottom (on January 20, 2015), Johnus admitted to having access to Jim's Blazer on the day that Tiffanie went missing, and that at times during that day, he was not in the company of his wife. Johnus also told the sheriff that Jim's Blazer broke down about one mile from the sawmill and that strangers had stopped to help him. He stated that the strangers allowed him to use their cell phone so that he could send text messages to his wife, Amber. On the other hand, FBI Special Agent Horan, who specialized in the analysis of cell phone records and data, testified that during the time period between 12:50 p.m. and 1:26 p.m., when the text messages were sent from Tiffanie's cell phone to Johnus's shared cell phone (which was in Amber's sole possession at the time), Tiffanie's cell phone was near the areas where her body and later her cell phone were found.

[61] Tiffanie's cell phone was recovered from Lake Sullivan, approximately one-half mile from the sawmill. All of the text messages on Tiffanie's cell phone, sent on the day she went missing, had been deleted.

[62] Even though law enforcement had not revealed certain facts and evidence uncovered during the investigation of the crimes before conducting their interviews, when officers interviewed Amber, she told them that Johnus had no marks on his body, no signs of struggle, and that "[i]f you're getting choked, you fight back." *Id.* at 105-106.

[63] At trial, John Cline, who was an inmate in the same cellblock as Johnus from August 2015 through February 2016, testified that Johnus stated he did not feel

badly about what he had done to Tiffanie because she had slandered him and created problems for his family but that he did feel badly for what he had done to the baby. Cline further testified that Johnus stated "you'd be amazed what you can live with when you have to" and asked Cline if he thought God would forgive him (Johnus) for his sin. Tr. Vol. VI, p. 13.

[64] Although there was no eyewitness to the crimes, or confession by Johnus of the crimes, and no single fact alone that proves Johnus killed Tiffanie and her unborn child, however, we find that the total of the collective circumstantial evidence was sufficient to allow a reasonable jury to find that Johnus killed Tiffanie and her unborn child. Johnus's arguments to the contrary are merely invitations for us to reweigh the evidence, which this court cannot do. *See Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (appellate court cannot reweigh evidence or judge the credibility of witnesses). Sufficient evidence supports Johnus's murder convictions.

# IV. Double Jeopardy

[65] Johnus next contends that his convictions violate the double jeopardy clause of the Indiana Constitution. Article I, section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Two offenses are the "same offense" in violation of Indiana's double jeopardy clause if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged

offense. *Spivey v. State,* 761 N.E.2d 831, 832 (Ind. 2002). We review de novo whether a defendant's convictions violate this provision. *See Spears v. State*, 735 N.E.2d 1161, 1166 (Ind. 2000) (noting that although our supreme court has not "expressly ruled" on the standard of review in double jeopardy cases, it frequently has treated reasonable possibility as a matter of law for de novo review).

[66] Johnus contends he was subjected to double jeopardy under the "actual evidence" test. According to Johnus, "the record reflects a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of Murder of the fetus also may have been used to establish all of the essential elements of Murder of [Tiffanie]." Appellant's Br. p. 53.

[67] To demonstrate two challenged offenses are the same under the actual evidence test, a defendant must demonstrate a reasonable possibility the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Richardson v. State*, 717 N.E.2d 32, 53 (Ind. 1999). We conduct our analysis by examining the evidence presented at trial to determine whether each challenged offense was established by separate and distinct facts. *Id*. There is no double jeopardy violation when the evidentiary facts establishing the essential elements of one offense establish only one or even several, but not all, of the elements of a second offense. *Spivey*, 761 N.E.2d at 833. Double jeopardy is not implicated where different victims are involved. *See Richardson*, 717 N.E.2d at 50, n.40 ("[I]f a defendant is charged with murdering A and

murdering B, further inquiry into whether the offenses are the "same offense"
for double jeopardy purposes is not warranted because the charged crimes are
different on their face. They involve different victims.").[6]

[68] Here, there are two separate victims:  Tiffanie and her unborn child.  Therefore,
we conclude that there is no double jeopardy violation under the actual
evidence theory claimed by Johnus.

# V. Abuse of Discretion at Sentencing

[69] Johnus next challenges his sentence to consecutive terms of sixty years for each
murder conviction, arguing that the trial court abused its discretion when it
sentenced him.  Sentencing decisions are within the sound discretion of the trial
court and are reviewed only for an abuse of that discretion.  *Anglemyer v.
State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.
An abuse of discretion occurs if the decision is clearly against the logic and
effect of the facts and circumstances before the court, or the reasonable,
probable, and actual deductions to be drawn therefrom.  *Id.*  A trial court
may abuse its discretion in sentencing by failing to enter a sentencing statement,

---

[6] Our Courts have repeatedly upheld this principle, finding no double jeopardy violation where there
are multiple victims of the same crime.  *See Bald v. State*, 766 N.E.2d 1170, 1172 n.4 (Ind. 2002) (no double
jeopardy violation where defendant was convicted of one count of arson and three counts of felony murder
based upon three deaths and one bodily injury that arose out of one fire); *see also Whaley v. State*, 843 N.E.2d
1, 15 (Ind. Ct. App. 2006) (two convictions for resisting law enforcement did not violate double jeopardy
even though defendant's actions involved a single incident of resisting because defendant injured two people
as a result of his resistance), *trans. denied; Williamson v. State*, 798 N.E.2d 450, 456-57 (Ind. Ct. App. 2003)
(defendant's five arson convictions, each of which pertained to a different arson victim, did not implicate
double jeopardy), *trans. denied*.

entering a sentencing statement that explains reasons for imposing a sentence which the record does not support, omitting reasons that are clearly supported by the record and advanced for consideration, or giving reasons that are improper as a matter of law. *Id.*

## A. Aggravating Circumstances

Per its sentencing order, the trial court found the following aggravating circumstances: 1) the nature and circumstances of the crimes, specifically the concealment of the crimes for nearly two months, the disposing of Tiffanie's cell phone, the abandonment of Tiffanie's body in a cornfield and exposed to the elements, and Johnus's callousness in the commission of the crimes; 2) Johnus's criminal history, with emphasis on his prior battery charges and convictions; 3) the fact that Johnus and Tiffanie were stepsiblings which the trial court found should have left Tiffanie without reason to believe her stepbrother would murder her and her unborn child – "especially in light of the fact, [sic] that by being pregnant she was more vulnerable and less able to fend off an attack;" and 4) "the victim's unborn child, who was viable, was dependent solely on his mother for protection and as such was completely vulnerable." Appellant's App., Vol. V, p. 143. Johnus argues the trial court abused its discretion in finding aggravators 2, 3, and 4.

### 1. Criminal History

First, Johnus argues that the trial court abused its discretion by finding his criminal history to be an aggravating circumstance. In its sentencing order, the

trial court determined the following regarding Johnus's criminal history as an aggravating factor:

> The Defendant has a criminal history, which consists of two (2) juvenile adjudications and twelve (12) adult convictions. As for the twelve (12) adult convictions, two (2) were for the offense of Battery Causing Bodily Harm and two (2) were for Domestic Battery. In addition to said convictions, the Defendant was charged in two (2) other battery cases, with same resulting in dismissals. The most recent battery charge, in 2014, involved allegations of a battery against a girlfriend. In total, the Defendant has been charged six (6) times as an adult for the offense of battery and has received four (4) convictions. The Defendant also has one (1) juvenile adjudication for the offense of battery. In examining the Defendant's criminal history, the Court does note that his battery charges have graduated from the juvenile offense of battery against law enforcement to batteries against others, including three instances of charges or allegations of battery against women, with two (2) such charges resulting in convictions. The Defendant's criminal history, with respect to prior charges and convictions for battery, demonstrates that the Defendant is unable to control his anger and his emotions. Moreover, the Court finds that Defendant's prior contact with police authority and the criminal justice system has not been successful at deterring his unlawful behavior. The Court does consider the Defendant's criminal history to be an aggravating factor.

*Id*. at 142. Johnus, specifically contends that the trial abused its discretion by considering the two dismissed battery charges. He also argues that his criminal history is "relatively minor and old and, therefore, not a valid aggravating circumstance." Appellant's Br. p. 56.

[72] The extent, if any, that a sentence should be enhanced based on prior convictions turns on the weight of an individual's criminal history. *Duncan v. State*, 857 N.E.2d 955, 959 (Ind. 2006). This weight is measured by the number of prior convictions and their gravity, by their proximity or distance from the present offense, and by any similarity or dissimilarity to the present offense that might reflect on the defendant's culpability. *Id*. However, "we will not say that remoteness in time, to whatever degree, renders a prior conviction irrelevant." *Harris v. State,* 272 Ind. 210, 215, 396 N.E.2d 674, 677 (1979). The remoteness of criminal history does not preclude the trial court from considering it as an aggravating circumstance. *Bowling v. State*, 493 N.E.2d 783, 787 (Ind. 1986).

[73] Regarding dismissed charges, Johnus correctly asserts that a record of arrest, without more, does not establish the historical fact that a defendant committed a criminal offense and may not be properly considered as evidence of criminal history. *Tunstill v. State*, 568 N.E.2d 539, 544 (Ind. 1991). However, our supreme court has held that "such information may be relevant to the trial court's assessment of the defendant's character in terms of risk that he will commit another crime," *Ealy v. State*, 685 N.E.2d 1047, 1058 (Ind. 1997), and that prior arrests and pending charges not reduced to convictions are properly considered as reflective of defendant's character and indicative of risk of future crime. *See Tunstill*, 568 N.E.2d at 545. Our supreme court also has held that "[c]harges that do not result in convictions may be considered by the sentencing court in context, but something more than mere recitation unaccompanied by

specific allegations should be shown." *McElroy v. State*, 865 N.E.2d 584, 591 (Ind. 2007).

[74] Johnus does not dispute the fact that he has had numerous adverse contacts with the criminal judicial system. Johnus previously was convicted of four misdemeanor battery causing bodily harm charges, two of which involved domestic battery. He has one juvenile adjudication for misdemeanor battery on law enforcement. The trial court used the two dismissed battery charges to assess Johnus's character, determining: "[Johnus's] battery charges have graduated from the juvenile offense of battery against law enforcement to batteries against others, including three instances of charges or allegations of battery against women" and "[Johnus's] criminal history, with respect to prior charges and convictions for battery, demonstrates that the Defendant is unable to control his anger and his emotions." Appellant's App., Vol V, p. 142. The trial court did not abuse its discretion by finding his criminal history to be an aggravating circumstance.

### 2. Position of Trust

[75] Johnus next argues that the trial court abused its discretion in finding as an aggravating circumstance, essentially that, Johnus, as stepbrother, was in a position of trust with his stepsister, Tiffanie, and that "[t]he victim should not have had any reason to believe or fear that her own stepbrother would in fact take her life and that of her unborn child . . . ." *Id.* at 143. Per Johnus, his relationship with his stepsister was "too attenuated to constitute an aggravating circumstance." Appellant's Br. p. 58.

[76] The position of trust aggravator is often used in the context of the relationship between an adult and a minor where there is at least an inference of the adult's authority over the minor. *See, e.g.*, *Kincaid v. State*, 839 N.E.2d 1201 (Ind. Ct. App. 2005) (trial court properly considered defendant's position of trust with two-month-old victim as aggravator where defendant had admitted that victim was his son). However, the position of trust aggravator is not limited to situations in which an adult has violated a child's trust. The aggravator has been applied where an offender violated an adult victim's trust, where a defendant had more than a casual relationship with the victim and abused the trust resulting from that relationship. *See, e.g.*, *Cloum v. State*, 779 N.E.2d 84 (Ind. Ct. App. 2002) (position of trust aggravator applied where defendant killed his spouse); *Averitte v. State*, 824 N.E.2d 1283 (Ind. Ct. App. 2005) (record supported finding position of trust aggravator where adult stepdaughter helped murder stepfather).

[77] Here, Johnus and Tiffanie were stepsiblings. The fact that the two had been feuding around the time that Tiffanie was murdered does not undermine the intimacy of their relationship. Evidence was presented at trial that Johnus provided Tiffanie with prescription pills and money; he was concerned about Tiffanie's pregnancy; and he and Tiffanie were "really close" in an "odd" way for stepsiblings – "as if they had something more going on than just a friendly relationship." Tr. Vol. V, p. 225. Based upon these facts, we find that the trial court did not abuse its discretion in finding Johnus's position of trust as an aggravator.

### 3. Nature and Circumstances of the Crimes

[78]  Johnus next challenges the trial court's finding as an aggravating circumstance "the fact that the victim's unborn child, who was viable, was dependent solely on his mother for protection and as such was completely vulnerable." Appellant's App., Vol V, p. 143. Per Johnus, this circumstance cannot be aggravating because "it does not offer any basis for distinguishing this case from any other case of fetus murder." Appellant's Br. p. 60. However, our supreme court has held that "[g]enerally, the nature and circumstances of a crime is a proper aggravating circumstance. *Gomillia v. State*, 13 N.E.3d 846, 853 (Ind. 2014) (quoting *McCann v. State*, 749 N.E.2d 1116, 1120 (Ind. 2001)).

[79]  Essentially, Johnus is asking this court to disregard the surrounding facts and circumstances of his crimes. Tiffanie, who at the time of her death by strangulation, was eight months pregnant with her unborn child. It is common knowledge that at the death of a pregnant mother, and without proper medical assistance, an unborn child in the dead mother's womb cannot survive. Here, regarding the nature and circumstances of the crimes, the trial court articulated that Tiffanie's unborn child was dependent upon its mother for protection and was more vulnerable than other potential murder victims. The trial court did not abuse its discretion when considering the nature and circumstances of the crimes as an aggravating factor.

# B. Enhanced, Consecutive Sentencing

[80] Johnus next argues that the trial court abused its discretion by imposing enhanced sentences for his murder convictions and then ordering the sentences to be served consecutively. At the time of Johnus's crimes, Indiana Code section 35-50-2-3 (2007) provided that a person convicted of murder faces a sentencing range of forty-five to sixty-five years, with the advisory sentence being fifty-five years. At sentencing, the trial court found four aggravating circumstances and no mitigating circumstances, and the court sentenced Johnus to enhanced terms of sixty years for each conviction, to be served consecutively.

[81] We first address Johnus's contention that the trial court erred in imposing consecutive sentences. "Sentencing decisions rest within the sound discretion of the trial court and we review them only for abuse of discretion." *Johnson v. State*, 725 N.E.2d 864, 868 (Ind. 2000). "In order to impose consecutive sentences, the trial court must find at least one aggravating circumstance." *Marcum v. State*, 725 N.E.2d 852, 864 (Ind. 2000). Here, the trial court found four valid aggravating circumstances. The trial court did not abuse its discretion in imposing consecutive sentences.

[82] As for Johnus's contention that the trial court abused its discretion in enhancing his sentences, we disagree. "Only one valid aggravator is needed to sustain an enhanced sentence." *Reaves v. State*, 586 N.E.2d 847, 852 (Ind. 1992). Additionally, an enhanced sentence may be imposed where the only aggravating circumstance is a prior criminal history. *Duvall v. State*, 540 N.E.2d

34, 36 (Ind. 1989). As previously noted, the trial court found four aggravators. No error occurred here.

## VI. Appropriateness of Sentence

[83] Johnus claims that his 120-year sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. The defendant bears the burden of persuading this Court that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on the "culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[84] Our supreme court has further explained that "[s]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Id.* at 1222. "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[85] The advisory sentence is the starting point the General Assembly has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at

1081. Here, Johnus was convicted of two counts of murder, a felony, for which the sentencing range is between forty-five and sixty-five years, with an advisory sentence of fifty-five years. *See* Ind. Code § 35-50-2-3. The trial court sentenced Johnus to sixty years for each count, which is above the advisory sentence but below the maximum sentence allowed under the statute.

[86] As to the nature of the offense, the facts of this case indicate that Johnus, knowing that his stepsister, Tiffanie, was eight months pregnant, strangled her to death with the jacket she wore, causing death-by-asphyxiation of her unborn child; he left the bodies in a cornfield, exposed to the elements and to animals; he deleted text messages from Tiffanie's cell phone and threw her phone into Lake Sullivan; and he lied to law enforcement about the crimes. We decline to find that Johnus's sentence was inappropriate in light of the nature of the offense.

[87] Regarding his character, Johnus notes that he had a history of employment; he was married at the time the crimes were committed; he has three children, including "a now five-year-old son;" and, though he is "not a stranger to the criminal justice system, . . . his previous encounters have been minor in comparison to the present prosecution." Appellant's Br. p. 62. However, Johnus's poor character is reflected in his criminal history. Johnus has one juvenile adjudication for battery on a law enforcement officer. He has twelve convictions as an adult, including four prior convictions of misdemeanor battery causing bodily harm, with two of the four involving domestic battery. *See Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007) (when

considering character of offender, one relevant fact is criminal history). His criminal history shows an escalation in the seriousness of his crimes. *See Mills v. State*, 536 N.E.2d 290, 291 (Ind. 1989) (a "pattern of steadily escalating offenses" justified sentence beyond advisory sentence). Also, regarding his character, evidence of record indicated that Johnus fed Tiffanie's prescription pill habit; he deleted text messages from her cell phone; and the discovery of Tiffanie's body was delayed by fifty-five days because he lied to law enforcement about the crimes. Based upon the foregoing, we cannot say that Johnus's sentence was inappropriate in light of his character.

[88] Johnus also argues that his sentence is not appropriate when compared to the sentence the defendant received in *Hicks v. State*, 729 N.E.2d 144 (Ind. 2000) (defendant received sixty-year sentence for murder and feticide arising from killing of ex-girlfriend and twenty-nine-week-old fetus). However, Rule 7(B) does not require us to compare Johnus's sentence with sentences of other offenders but rather to duly consider the nature of the offenses and character of the offender before us today.

## Conclusion

[89] For the reasons stated, we find that the trial court did not abuse its discretion in admitting evidence, instructing the jury, or sentencing Johnus. There was sufficient evidence to support Johnus's convictions; his convictions did not violate double jeopardy principles; and his sentence is appropriate given the nature of the offenses and his character.

Affirmed.

May, J., and Altice, J., concur.